# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

ON MOTION FOR REHEARING

NO. 03-07-00127-CV

**Susan Combs, Successor to Carole Keeton Strayhorn, Comptroller of Public Accounts of the State of Texas, and Greg Abbott, Attorney General of the State of Texas, Appellants**

**v.**

**Chevron, Inc., Appellee**

FROM THE DISTRICT COURT OF TRAVIS COUNTY, 261ST JUDICIAL DISTRICT
NO. D-1-GN-04-003978, HONORABLE SCOTT JENKINS, JUDGE PRESIDING

# O P I N I O N

We withdraw our opinion of February 5, 2010, and substitute the following opinion in its place. Appellee's motion for rehearing is denied.

Chevron, Inc. sued Texas's Comptroller of Public Accounts to obtain a tax refund. Chevron had paid contractors to install temporary scaffolding at one of its refineries, and the Comptroller had treated that installation as a taxable rental of tangible personal property. Chevron argued that the installation should have been treated as a nontaxable service instead. More than eighteen months after it filed suit, Chevron amended its petition to add tax-refund claims that were unrelated to its scaffolding claim. Chevron then moved for partial summary judgment on the scaffolding claim. The trial court granted Chevron's motion over the Comptroller's objection, and

Chevron moved to sever its scaffolding claim from its remaining claims. The Comptroller objected to Chevron's severance motion and also filed a plea to the jurisdiction, arguing that the trial court lacked jurisdiction over Chevron's remaining claims because Chevron had not fulfilled the administrative prerequisites to suing on them. The trial court granted Chevron's motion to sever and denied the Comptroller's plea to the jurisdiction. The Comptroller appealed, arguing that the trial court erred in denying its plea to the jurisdiction and in granting Chevron's motion for partial summary judgment. We will reverse and render judgment for the Comptroller on both issues.

## FACTUAL AND PROCEDURAL BACKGROUND

Between 1993 and 1996, Chevron paid independent contractors to install temporary scaffolding at its Port Arthur refinery. The purpose of the scaffolding was to facilitate maintenance work on tall structures. The scaffolding contractors supplied scaffolding materials, erected the scaffolding, monitored its safety, and reconfigured or disassembled it when needed. The contractors always had supervisory employees on-site while the scaffolding was in use, but they did not themselves perform any maintenance work. Rather, other contractors and Chevron employees used the scaffolding to access areas that required maintenance.

Chevron paid $439,224.22 in tax on the scaffolding installation and later sought a refund of that amount, claiming that the installation was a nontaxable service. *See* Tex. Tax Code Ann. § 151.0101 (West 2008) (listing services that are taxable). The Comptroller refused to issue a refund, claiming that the installation qualified as a taxable rental of tangible personal property rather than as a service. *See id*. §§ 151.051 (tax imposed on "sale" of taxable items), .005(2) ("sale" includes rental of tangible personal property). Chevron administratively appealed the Comptroller's

2

determination. *See id*. §111.104 (procedures for administratively appealing tax-refund issues). When its appeal was denied, Chevron filed a motion for rehearing that included 98 new tax-refund claims unrelated to its scaffolding claim. *See id*. § 111.105 (procedures for filing motion for rehearing). The Comptroller objected, asserting that Chevron could not raise tax-refund claims for the first time in a motion for rehearing. The presiding administrative law judge denied Chevron's motion for rehearing without specifically addressing Chevron's 98 new claims.

Chevron then sued the Comptroller in Travis County District Court. *See id*. § 112.151. Chevron's original petition included only the scaffolding-related refund claim, but Chevron "reserve[d] its right to amend its pleadings with respect to" the 98 additional claims it had raised in its motion for rehearing. Chevron eventually moved for partial summary judgment on the scaffolding claim, and the Comptroller filed a cross-motion on the same subject. Shortly before the hearing on the motions, Chevron amended its petition to add two of the 98 claims it had introduced in its motion for rehearing.

The trial court proceeded to rule on the parties' summary judgment motions, granting Chevron's and denying the Comptroller's. Chevron then moved to sever its scaffolding claim from its two remaining claims. The Comptroller filed a plea to the jurisdiction on the two remaining claims, arguing that the trial court lacked jurisdiction over them because Chevron had raised them at an impermissible juncture in the administrative proceedings. To create trial court jurisdiction over the claims, the Comptroller argued, Chevron first had to exhaust all possible administrative remedies for them. *See MAG-T, L.P. v. Travis Cent. Appraisal Dist.*, 161 S.W.3d 617, 624 (Tex. App.—Austin 2005, pet. denied) ("[J]udicial review of administrative orders is not available unless

3

all administrative remedies have been pursued to the fullest extent."). The Comptroller argued that because Chevron first raised the claims in its motion for rehearing rather than in its initial tax-refund request, the Comptroller did not have a full opportunity to weigh the merits of the claims before accepting or rejecting them. The Comptroller also objected to Chevron's motion to sever, arguing that Chevron's two new causes of action were not properly severable because they were not independently sustainable owing to their jurisdictional defects.

Chevron responded to the Comptroller's plea to the jurisdiction by arguing that the tax code permitted it to sue on issues first raised in a motion for rehearing. *See* Tax Code § 112.152(a) ("[G]rounds of error contained in the motion for rehearing . . . may be raised in a suit."). The trial court denied the Comptroller's plea to the jurisdiction and granted Chevron's motion to sever, assigning a new cause number to Chevron's two remaining claims and entering a final judgment in the cause that now consisted only of the scaffolding claim. The Comptroller then perfected this appeal.

**STANDARD OF REVIEW**

We review summary judgments de novo. *Anderson-Clayton Bros. Funeral Home, Inc. v. Strayhorn*, 149 S.W.3d 166, 171 (Tex. App.—Austin 2004, pet. denied). Where, as here, both parties move for summary judgment, "we determine all questions presented and render such judgment as the trial court should have rendered." *Id*. at 172.

We review de novo the denial of a plea to the jurisdiction. *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). Whether a court has subject matter jurisdiction is a question of law. *Id*.

4

## DISCUSSION

### *Issue One:  Whether Chevron's Scaffolding Contracts Were Taxable*

The Comptroller argues that the installation of temporary scaffolding at Chevron's refinery was a taxable rental of property rather than a nontaxable service.  We agree, and we hold that the trial court therefore erred in granting Chevron's motion for partial summary judgment.

The tax code imposes taxes on certain sales and services.  *See* Tax Code §§ 151.051 (sales), .0101 (services).  Leases of tangible personal property qualify as taxable "sales."  *See id*. § 151.005(2).  Scaffolding qualifies as tangible personal property.  *See id*. § 151.009.  Erection, supervision, and disassembly of scaffolding, however, do not qualify as taxable services.  *See id*. § 151.0101.  Thus, if the installation of temporary scaffolding at Chevron's refinery qualified as a property rental under the tax code, it was taxable.  If it qualified as a service, it was not.

The tax code does not define "rental."  The Comptroller has, however, defined the term by rule:  a property "rental" is "[a] transaction, by whatever name called, in which possession but not title to tangible personal property is transferred for a consideration."  34 Tex. Admin. Code § 3.294(a)(2) (West 2009) (Comptroller of Pub. Accounts, Rental and Lease of Tangible Personal Property).  We adopt the Comptroller's definition because it comports with the tax code.  *See DuPont Photomasks, Inc. v. Strayhorn*, 219 S.W.3d 414, 419 (Tex. App.—Austin 2006, pet. denied) ("In determining whether a rule is valid, we are limited to ascertaining whether the rule is contrary to the relevant statute . . . . We will defer to an agency's interpretation as long as it is reasonable and does not contradict the plain meaning of the statute.") (citations omitted).  Thus, to determine whether the installation of temporary scaffolding at Chevron's refinery qualified as a taxable

5

property rental, we must determine whether possession of the scaffolding was transferred to Chevron.

Neither the tax code nor the Comptroller's rules define the term "possession" as it pertains to property rentals. The Comptroller has stated, however, that "[a] key element of 'possession' is 'operational control' over the tangible personal property . . . . A lessee must exercise operational control of the leased property in order to take possession thereof." Tex. Comptroller of Pub. Accounts, Hearing No. 40,812, STAR Document No. 200310344H (Oct. 30, 2003). "Operational control," in turn, means "using, controlling, or operating the tangible personal property." *Id*.

"Unlike cranes, bulldozers, and backhoes, which require 'operation' while being used for the desired result, no operation of scaffolding is required when in use." Tex. Comptroller of Pub. Accounts, Hearing No. 40,239, STAR Document No. 200411975H (Nov. 22, 2004). In other words, "once erected, scaffolding fulfills its purpose by remaining stationary." *Id*. Thus, exercising "operational control" over scaffolding means using it to access high-up areas. *See* Tex. Comptroller of Pub. Accounts, Hearing No. 44,297, STAR Document No. 200512527H (Dec. 16, 2005) ("[A]ssembly of the scaffolding does not constitute operation . . . *the use of the scaffolding by the customers provides the element of possession typically incident to a rental or lease transaction*.") (emphasis added); *see also* Tex. Comptroller of Pub. Accounts, Hearing No. 40,239, STAR Document No. 200411975H (Nov. 22, 2004) (stating that employees of scaffolding-installation company "are not operators. They assemble the scaffolding in the location selected by Claimant. Claimant then uses the scaffolding to achieve its desired result—access to the facility location in

6

need of work."); Tex. Comptroller of Pub. Accounts, Hearing No. 43,531, STAR Document No. 200508353H (Aug. 29, 2005) (scaffolding installers not "operators" of scaffolding, even though required "to be onsite at Claimant's facility," because "once the scaffolding is assembled it is used by either Claimant's employees or by Claimant's vendors to perform any necessary plant repairs or maintenance.").

The above-cited Comptroller decisions make it clear that the Comptroller believes "operational control" over scaffolding is exercised by whoever uses the scaffolding to access high-up areas. Courts should defer to the Comptroller's interpretation of her own rules. *See Myers v. State*, 169 S.W.3d 731, 734 (Tex. App.—Austin 2005, no pet.) ("Courts should defer to an agency's interpretation of its own rules, unless the agency's interpretation is inconsistent with the regulation."). The trial court nevertheless determined that Chevron's contractors retained operational control over the scaffolding because they controlled access to it.[1] That determination was error because controlling *access* to scaffolding is not the same thing as controlling *use* of scaffolding. As the Comptroller's decisions make clear, *use* of scaffolding determines operational control. *See* Tex. Comptroller of Pub. Accounts, Hearing No. 44,297, STAR Document No. 200512527H (Dec. 16, 2005) ("the use of the scaffolding by the customers provides the element of possession typically incident to a rental or lease transaction."). Here, it is undisputed that the only people who used the scaffolding to access high-up areas were Chevron employees and maintenance contractors

---

[1] In a letter to the parties, the trial court explained that it based this conclusion on the facts "that the contractor's employees inspected the scaffolding before every shift and tagged it as safe or unsafe, that Chevron's employees and other contractors were directed to follow all instructions of the scaffolding contractor regarding its use, and that employees of the scaffolding contractor were constantly present when the scaffold was in use."

whose services are not at issue. Thus, under the Comptroller's unequivocal precedent, possession of the scaffolding was transferred to Chevron. And because that precedent "is reasonable and does not contradict the plain meaning of the [relevant] statute," we defer to it. *DuPont Photomasks*, 219 S.W.3d at 419.

Because possession of the scaffolding was transferred to Chevron, a "rental" occurred for Tax Code purposes. That fact does not end our inquiry, however, because it is also undisputed that the contracts at issue incorporated non-taxable services including the erection, oversight, and disassembly of the scaffolding. To determine the tax status of contracts that incorporate both taxable and non-taxable elements, we look to the contracts' primary purpose or "essence." *See Rylander v. San Antonio SMSA Ltd. P'ship*, 11 S.W.3d 484, 487 (Tex. App.—Austin 2002, no pet.) ("When a nontaxable service is bundled with a taxable sale or service, we apply the 'essence-of-the-transaction' doctrine to determine whether the service is a part of the sale."). Put another way,

> [i]f the real object of a mixed transaction is the purchase of equipment which is taxable, and the service element is incident to that purchase, the entire transaction is taxable. On the other hand, if the essence of the transaction is the purchase of a nontaxable service, which incidentally includes the purchase of some other service or equipment that is taxable, the entire transaction is nontaxable.

*Id*. (citations omitted).[2]

---

[2] The Comptroller often employs a five-factor test to determine the taxability of transactions that have both taxable and non-taxable elements. *See, e.g.*, Tex. Comptroller of Pub. Accounts, Hearing No. 25,040, STAR Document No. 8911H0966G01 (Nov. 10, 1989). This approach treats "essence of the transaction" as but one factor among others, including operational control, the "sweaty brow" factor (i.e., who supplies the majority of labor), labor as the primary cost component, and nearness to traditional rental. *See id*. Other Comptroller decisions, however, make it clear that

8

We think it indisputable that the essence of Chevron's scaffolding contracts was the rental of the scaffolding itself, not the attendant services. Chevron's underlying goal in executing the contracts was to facilitate maintenance work at its refinery. It was scaffolding, not the services incidental to use of scaffolding, that Chevron primarily wanted. To put it another way, Chevron would (if possible) have gladly used the scaffolding without purchasing the attendant services. On the other hand, the attendant services would have been useless to Chevron without the ability to use the scaffolding to perform maintenance work.

Chevron argues that this analysis is overly simplistic because services were necessary to render the scaffolding usable. But just because services are a necessary part of a lease contract does not mean that those services are the essence of the contract. Texas law draws no distinction

---

"essence of the transaction" is the overriding issue and that the factorial approach is merely an analytical tool to help arrive at it. *See, e.g.*, Tex. Comptroller of Pub. Accounts, Hearing No. 43,531, STAR Document No. 200508353H (Aug. 29, 2005) ("All of the above factors assist in determining the real issue here: what is the 'essence of the transaction?'"). Importantly, the very decision that created the factorial test treats "essence of the transaction" as the ultimate issue. *See* Tex. Comptroller of Pub. Accounts, Hearing No. 16,023, STAR Document No. 8504H0634A13 (Apr. 19, 1985) (treating "essence of the transaction" as ultimate test and examining other factors as means of determining it). That is to say, a close examination of that decision reveals that it did not treat "essence of the transaction" as merely a factor, but rather treated it as the issue that the other factors were supposed to help analyze. *See id*. Furthermore, placing ultimate emphasis on the "essence of the transaction" comports with our established precedent. *See Sharp v. Direct Res. for Print, Inc.*, 910 S.W.2d 535, 538 (Tex. App.—Austin 1995, writ denied) ("The established test for determining whether a transaction is subject to sales tax involves the determination of the ultimate object or the essence of the transaction.") (citing *Bullock v. Statistical Tabulating Corp.*, 549 S.W.2d 166, 167 (Tex. 1977)). The Comptroller has recognized the applicability of this precedent. *See* Tex. Comptroller of Pub. Accounts, Hearing No. 44,297, STAR Document No. 200512527H (Dec. 16, 2005) ("The Texas courts, in determining the essence of mixed transactions that include both tangible personal property and services, have looked to what is the ultimate object or purpose of the transaction.") (citing *Direct Res.*, 910 S.W.2d 535). Thus, we decline to engage in a five-factor analysis and instead look only at the "essence of the transaction." We note, however, that such an analysis would result in the same outcome here.

9

between necessary and unnecessary services in determining a contract's tax status. *See* Tax Code § 151.0101; *see also* 34 Tex. Admin. Code § 3.294(d)(4) ("Charges in [a] lease agreement for labor, such as charges for supervision, set-up, hook-up, assembly or disassembly, erection, and dismantling, are included in the lease price and are taxable."). Rather, the determinative issue is the contract's "essence." *See Rylander*, 11 S.W.3d at 487.

We reemphasize that Chevron's overriding goal in executing the scaffolding contracts was to facilitate maintenance work. That work was performed by Chevron employees and by contractors whose contracts are not at issue here. If the contractors who performed the maintenance work had provided their own scaffolding, we would have no trouble finding that the essence of their contracts was a nontaxable service (maintenance) rather than a taxable rental of property (scaffolding). The scaffolding contracts at issue here, however, did not cover the maintenance work that was Chevron's ultimate end.

Chevron tries to analogize the scaffolding contractors' services to, among other things, the piloting of a chartered plane and the driving of a limousine, both of which the Comptroller treats as nontaxable services rather than taxable property rentals. This analogy fails because those activities both involve a contractor actively operating the rented property for the duration of the transaction. *Cf.* Tex. Comptroller of Pub. Accounts, Hearing No. 40,239, STAR Document No. 200411975H (Nov. 22, 2004) ("Unlike cranes, bulldozers, and backhoes, which require 'operation' while being used for the desired result, no operation of scaffolding is required when in use."). Here, in contrast, while experts erected, disassembled, and even supervised the scaffolding, they did not actively manipulate it while its intended purpose (maintenance work) was

10

carried out. *See* Tex. Comptroller of Pub. Accounts, Hearing No. 44,297, STAR Document No. 200512527H (Dec. 16, 2005) ("the erection and dismantling were of no intrinsic value, except as a means to obtain scaffolding" for performance of maintenance work). The Comptroller has repeatedly examined scaffolding contracts and invariably ruled that they were essentially rentals even though they necessarily involved nontaxable services. *See* Tex. Comptroller of Pub. Accounts, Hearing No. 46,545, STAR Document No. 200904484H (Apr. 30, 2009) ("[T]he Comptroller has consistently . . . held that the services that are performed in connection to scaffolding, such as the design, the erection labor, or the dismantling labor, are all services that are part of the rental of tangible personal property."). These rulings are entitled to deference. *See Myers*, 169 S.W.3d at 734. We therefore hold that the Comptroller was entitled to summary judgment on Chevron's scaffolding-related tax-refund issue.

### *Issue Two: The Comptroller's Plea to the Jurisdiction*

The Comptroller filed a plea to the jurisdiction after the trial court granted Chevron partial summary judgment on the scaffolding issue. The plea asserted that the trial court lacked jurisdiction over Chevron's remaining claims because Chevron did not exhaust its administrative remedies for them. Chevron's initial administrative refund request addressed only the scaffolding issue, but after the Comptroller refused to issue a refund, Chevron filed a motion for rehearing that included 98 new, unrelated claims. The Comptroller's plea addressed the two of those claims that Chevron added to this lawsuit.

"In order to maintain an action against the Comptroller for a refund of taxes, a party must meet the procedural requirements of the tax protest law. Compliance with these procedures

11

is a jurisdictional prerequisite for the trial court to hear and decide the merits of a tax refund suit." *Central Power & Light Co. v. Sharp*, 919 S.W.2d 485, 491 (Tex. App.—Austin 1996, writ denied) (citations omitted). The administrative procedures for filing a tax protest are contained in Tax Code sections 111.104 and 111.105. At the time Chevron filed its tax-refund claim in 2002, section 111.104 stated that a refund claim had to "be written," had to "state the grounds on which the claim is founded," and had to be "filed before the expiration of the applicable limitation period."[3] Section 111.105(c) states that a "tax refund claimant who is dissatisfied with the decision on the claim is entitled to file a motion for rehearing." Tax Code section § 112.151 states categorically that a party must have followed the administrative procedures specified in both sections 111.104 and 111.105 before it can bring a lawsuit on a tax refund claim.

This statutory scheme makes clear that trial courts only have jurisdiction over tax refund claims that are first raised in accordance with Tax Code section 111.104 and then appealed in a motion for rehearing under Tax Code section 111.105. In other words, there are two parts to the administrative procedure that creates trial-court jurisdiction over tax refund claims. Chevron completed only the second part, the filing of a motion for rehearing, for the claims that the Comptroller challenges in its plea to the jurisdiction. We therefore conclude that the trial court lacked jurisdiction over those claims. *See Sharp*, 919 S.W.2d at 491 (no trial-court jurisdiction over tax refund claims unless claimant followed all administrative procedures).

---

[3] Tax Code section 111.104 was revised in 2003. *See* Act of June 20, 2003, 78th Leg., R.S., ch. 1310, § 86, 2003 Tex. Gen. Laws 4782. The requirement that a tax-refund claim "state *the grounds* on which the claim is founded" became a requirement that a tax-refund claim "state *fully and in detail each reason or ground* on which the claim is founded." *See id*. (emphasis added).

12

Chevron argues that raising claims in a motion for rehearing is enough to create trial-court jurisdiction. While Tax Code section 112.152(a) does indeed say that "grounds of error contained in the motion for rehearing are the only issues that may be raised in a suit," it is obvious that this statute sets forth a necessary but not a sufficient condition for trial-court jurisdiction. In other words, while the statute says that raising a tax-refund claim in a motion for rehearing is a prerequisite to filing suit, it does not say that raising a tax-refund claim in a motion for rehearing is the *only* prerequisite to filing suit. Were that interpretation of the statute correct, Tax Code section 112.151 would be nullified. *See* Tax Code § 112.151 (before filing suit on tax refund claim, party must follow procedures in Tax Code section 111.104 as well as file motion for rehearing under section 111.105). We reject statutory interpretations that have such results. *See* Tex. Gov't Code Ann. § 311.021 (West 2005) (must presume entire statute is intended to be effective). Furthermore, the term "motion for rehearing" necessarily implies an antecedent hearing. Thus, as a matter of logic, a party cannot validly raise a claim for the first time in a motion for rehearing. Finally, Chevron's position is defeated by the very tax code section that establishes the motion-for-rehearing procedure, which states that a "tax refund claimant *who is dissatisfied with the decision on the claim* is entitled to file a motion for rehearing." Tax Code § 111.105(c) (emphasis added). This language clearly indicates that a motion for rehearing can only include claims that the Comptroller has already decided on.

Because Chevron failed to fulfill all administrative prerequisites to filing suit, the trial court lacked jurisdiction over the claims Chevron first raised in its motion for rehearing. The Comptroller's plea to the jurisdiction should have been granted.

13

As a corollary of this holding, we also hold that the trial court erred in granting Chevron's motion to sever. "[A] trial court properly exercises its discretion in severing claims when: (1) the controversy involves more than one cause of action; (2) the severed claim is one that could be asserted independently in a separate lawsuit; and (3) the severed actions are not so interwoven with the other claims that they involve the same facts and issues." *See Liberty Nat'l Fire Ins. Co. v. Akin*, 927 S.W.2d 627, 630 (Tex. 1996). Here, the second requirement was not met because the trial court had no jurisdiction over the claims Chevron moved to sever. Accordingly, severance was error.

## CONCLUSION

Chevron was essentially renting property, not obtaining services, when it contracted for the use of temporary scaffolding. Thus, its contracts were taxable, and the Comptroller was entitled to summary judgment on Chevron's scaffolding-related tax-refund claim. The trial court lacked jurisdiction over Chevron's other claims because Chevron did not follow the required administrative procedures before suing on them. We reverse and render judgment in favor of the Comptroller.

_____

David Puryear, Justice

Before Justices Patterson, Puryear and Pemberton

Reversed and Remanded on Motion for Rehearing

Filed: April 9, 2010

14