

In The

Court of Appeals

Seventh District of Texas at Amarillo

_____

No. 07-11-0025-CV

_____

VERIZON BUSINESS NETWORK SERVICES, INC., APPELLANT

V.

SUSAN COMBS, COMPTROLLER OF PUBLIC ACCOUNTS OF THE STATE OF TEXAS, AND GREG ABBOTT, ATTORNEY GENERAL OF THE STATE OF TEXAS, APPELLEES

On Appeal from the 353rd District Court
Travis County, Texas
Trial Court No. D-1-GN-07-004221
Honorable Stephen Yelenosky, Judge Presiding

April 3, 2013

MEMORANDUM OPINION

Before QUINN, C.J., and HANCOCK and PIRTLE, JJ.

Appellant, Verizon Business Network Services, Inc., operates a nationwide telecommunications network that includes switch systems operated by custom software. In December 2007, Verizon filed suit in district court seeking a tax refund in the amount of $19,641,188.54 for sales and use taxes paid on software acquired during the refund

period, January 1, 1996 to August 31, 2000. Following a bench trial, the trial court entered a judgment in favor of Appellees, Susan Combs, Comptroller of Public Accounts of the State of Texas, and Greg Abbott, Attorney General of the State of Texas, granting Verizon a partial refund of $1,507,649.45, but denying all other relief.[1]

Verizon appeals that judgment asserting: (1) it is entitled to a refund of the sales and use taxes paid on services it acquired to update the software used to operate the switches in its nationwide telecommunications network, (2) the evidence was legally and factually insufficient to support the trial court's finding that software services acquired during the refund period were taxable under sales and use tax statutes,[2] and (3) it is entitled to a refund of interest assessed by the Comptroller on any delinquent taxes that would have been offset by the partial refund granted by the trial court. We affirm.

BACKGROUND

In the early 1990s, Verizon contracted with three vendors, Northern Telecom, Inc. (Nortel), DSC Communications Corporation which later became Alcatel USA Marketing, Inc. (DSC/Alcatel), and Ericsson Network Systems, Inc. (Ericsson) to replace its analog switches with digital switches. Among other things, the switches in question were designed to route long distance calls to their desired locations. The newly installed switches included software programs designed to operate the switches. After

---

[1]The Texas Tax Code authorizes tax refund suits. *See* TEX. TAX CODE ANN. § 112.151 (West 2008). The Comptroller and Attorney General are necessary parties to a taxpayer suit. *Id.* at § 112.151(b). Since the interests of the Comptroller and Attorney General do not diverge in this case, we will refer to both collectively as "the Comptroller."

[2]Because the disputed taxes were incurred between 1996 and 2000, tax statutes and rules existing then are applicable to our analysis. Unless otherwise noted, however, where there was no material change in the applicable statutes, regulations or rules, we will cite to their current versions.

2

Nortel, DSC/Alcatel and Ericsson sold the switches to Verizon, they continued to develop software programs to enhance the switches' operational performance. The parties refer to these software developments as "feature enhancements" or "software loads." To create a feature enhancement, the vendor re-wrote some code in the switches' operating software and created new code that produced new and/or modified computer programs that were subsequently loaded into the switches. For example, software loads developed by the vendors permitted the switches to handle increased caller capacity, multiple messaging, new filing capabilities, phone number portability and more effective transmission of emergency government communications over Verizon's network.

The commercial relationship between Verizon and its vendors was governed by purchase agreements executed, for the most part, in the early 1990s and renewed through a series of amendments thereafter. Typically, Verizon would request a feature enhancement to perform a particular task. Once Verizon and the vendor agreed on the specifications for the new software program, the vendor would assemble a software development team comprised of software development engineers, test engineers, project managers and specification writers to modify and/or create new code to obtain the new feature or functionality sought by Verizon. Once the new software program was completed it would be combined with the switches' original operating software into a "software load" which was sent to Verizon's test laboratory in Richardson, Texas, where it was loaded onto a "testbed" and tested in an emulated network that had all the components of a real network to determine whether it "conform[ed] to specifications" and was "capable of carrying revenue producing or tandem traffic." After the Laboratory

validated the software load, it was then tested in two field offices. If the field tests were successful, Verizon notified the vendor to make copies of the software load and send it to the switches for installation according to a schedule established by Verizon. Shortly thereafter, the Laboratory conducted a "compare" test to determine whether the software load installed at the switches matched the test program. Thereafter, the original program remained at the Richardson Laboratory, in order to troubleshoot any problems in a controlled environment. Once installed at the Laboratory, feature enhancements were not removed from the testbed until they were eliminated from the network.

A review of Verizon's procurement documents and invoices for the feature enhancements indicates that Verizon paid a lump sum price for each software program. Richard Yeats, Verizon's Principal Contract Administrator, testified that, "[b]ecause we paid one price the vendor took care of all the operations including getting to the site, having everything there to install the feature enhancement . . . ." Yeats further testified that the "[v]endor never broke down the lump sum price by site because he was developing software, not allocating where it should go." Further, the procurement documents and, with a few exceptions, the invoices indicate that the software loads containing the feature enhancements were first shipped by vendors to the Richardson Laboratory. Many of the invoices for DSC/Alcatel and Nortel contained the following notations: "Install at Lab Richardson," "SITE: Richardson" and "Destination: Richardson, TX."

Following the entry of judgment, at Verizon's request, the trial court issued *Findings of Fact and Conclusions of Law*, in pertinent part, as follows:

# I. FINDINGS OF FACT

1. [Verizon] operated telecommunications facilities throughout the United States, including Texas during the refund period of January 1, 1996 through August 31, 2001 (the "Period").

2. [Verizon] filed tax refund claims under Tax Code § 111.104 for the recovery of $19,641,188.54, plus statutory interest.

3. All procedural steps required for [Verizon] to file a suit for refund under Chapter 112 of the Tax Code were met by [Verizon].

4. [Verizon] paid sales and use tax in the amount of $1,507,649.45 upon purchases of hardware and non-customized software, as referenced on worksheets 2, 5, 6, and 7 included in Joint Exhibit 1.

5. The hardware and non-customized software referenced . . . in Joint Exhibit 1 were shipped by the vendor to out-of-state locations and never used in Texas.

6. [Verizon] paid sales and use tax on the purchase of a single license to use computer software described as feature enhancements to existing software.

7. The feature enhancements were first shipped to and used in Richardson, Texas.

8. The feature enhancements purchased by [Verizon] were purchased from the original vendors from whom [Verizon] purchased its other existing computer programs that function on its telecommunications network.

9. The feature enhancements added instructional code to existing computer programs being used by [Verizon] on its telecommunications network which allowed existing features on the network to work in a different way, such as more efficient prioritization of calls across the network, and added new features to the network, such as increasing call capacity of the network switches and allowing for phone number portability.

10. The feature enhancements processed data and produced results thereby enabling features on [Verizon]'s telecommunications network to operate in a new or different manner.

11. The feature enhancements were tested by [Verizon] in Richardson, Texas, before being implemented across its nationwide tele-communications network.

12. The feature enhancement software remained on [Verizon]'s equipment in Texas after testing, and continued to be used in Richardson, Texas, to provide various types of technical support regarding [Verizon]'s telecommunications network.

13. The Comptroller calculated her counterclaim using estimates.

## II. CONCLUSIONS OF LAW

1. No sales or use tax is due on the hardware and non-customizable software referenced on worksheets 2, 5, 6, and 7 included in Joint Exhibit 1 because the hardware and non-customizable software was not delivered to or used in Texas.

2. [Verizon] is entitled to a refund of the sales and use tax in the amount of $1,507,649.45, plus statutory interest provided by Tax Code § 112.155, related to its purchases of the hardware and non-customizable software referenced on worksheets 2, 5, 6, and 7 included in Joint Exhibit 1.

3. The feature enhancements are a computer program as defined in Tax Code § 151.0031.

4. [Verizon]'s purchases of the feature enhancements are subject to sales and use tax because the feature enhancements are tangible personal property that was possessed and used in Texas.

5. [Verizon] failed to meet its burden of proof to show that it is entitled to a refund of sales and use tax paid upon its purchases of the feature enhancements.

\* \* \*

DISCUSSION

Verizon asserts that its purchases were a required service, i.e., maintenance necessary to update and maintain software originally installed in the 1990s and, as such, those purchases were exempt from Texas sales and use tax. In order to understand the transactions at issue here, we find it necessary to go into some detail regarding Verizon's purchases.

6

Verizon first asserts that the Texas sales and use tax is inapplicable to the refund period transactions in question because those transactions were contracts for software *services* that were necessary to maintain and/or remodel the operating software used by its existing switches. Verizon further contends the service provided by these transactions benefitted its entire nationwide network and, as a result, should be apportioned to its principal place of business in Washington, D.C., under the Comptroller's "service benefit rule." Alternatively, Verizon asserts that each switch represented an identifiable segment of its business and the software service charges should be apportioned to each individual switch. In the further alternative, Verizon contends that, if the feature enhancements are found not to be services but instead are derived from the sale or use of tangible personal property, it is entitled to a refund of taxes paid for feature enhancements utilized by switches outside of Texas. Lastly, Verizon contends that we should reform the trial court's judgment to require the Comptroller to refund all interest on any delinquent tax assessed for the refund period that is offset by the $1,507,649.45 refund ordered by the trial court. For the reasons stated below, we disagree. Logic dictates that we address Verizon's first and second issues together.

I. STANDARD OF REVIEW

A. LEGAL & FACTUAL SUFFICIENCY

In a suit for a tax refund, a taxpayer must conclusively establish that a tax was overpaid and the exact amount of that overpayment. *Baker v. Bullock*, 529 S.W.2d 279, 281 (Tex.Civ.App.—Austin 1975, writ ref'd n.r.e.). As the plaintiff in this tax refund case,

Verizon had the burden of proving, by a preponderance of the evidence, that it was entitled to a refund. *See GATX Terminals Corp. v. Rylander*, 78 S.W.3d 630, 634, 636 (Tex.App.—Austin 2002, no pet.) (collected cases cited therein).

In this case, after a trial *de novo*, the trial court granted judgment in favor of the Comptroller on Verizon's refund claim. It later issued findings of fact and conclusions of law. In a bench trial, the trial court's findings of fact have the same force and effect as a jury verdict. *Chevron Pipeline Co. v. Strayhorn*, 212 S.W.3d 779, 783 (Tex.App.—Austin 2006, pet. denied) (citing *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994)). Appellate courts review the legal and factual sufficiency of the trial court's findings of fact according to the same standards applied to jury findings. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996).

On appeal, Verizon challenges the legal sufficiency of the trial court's conclusion that it was liable for the sales and use taxes imposed on the basis of feature enhancements purchased during the refund period. As such, our consideration of Verizon's challenge is guided by the Supreme Court's decision in *City of Keller v. Wilson*, 168 S.W.3d 802 (Tex. 2005). *See MBM Financial Corp. v. The Woodlands Operating Co., L.P.*, 292 S.W.3d 660, 663 n.3 (Tex. 2009). In reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *See City of Keller*, 168 S.W.3d at 807.

Anything more than a scintilla of evidence is legally sufficient to support the finding. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996). Evidence does not exceed a scintilla if it is "so weak as to do no more than create a mere surmise or suspicion" that the fact exists; *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004), and more than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.*, 77 S.W.3d 253, 262 (Tex. 2002). So long as the evidence falls within the zone of reasonable disagreement, we may not substitute our judgment for that of the fact finder. *City of Keller*, 168 S.W.3d at 822. Moreover, the trial court who observed the witnesses and heard the testimony first hand is the sole judge of the credibility of those witnesses and the weight given to their testimony. *Woods v. Woods*, 193 S.W.3d 720, 726 (Tex.App.—Beaumont 2006, pet. denied). *See also City of Keller*, 168 S.W.3d at 819.

In reviewing a factual sufficiency challenge, we consider all the evidence and set aside a finding only if it is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *THI of Texas at Lubbock I, LLC v. Perea*, 329 S.W.3d 548, 572 (Tex.App.—Amarillo 2010, pet. denied) (citing *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996)).

B.    STATUTORY INTERPRETATION

In general, matters of statutory construction are questions of law rather than issues of fact. *City of Garland v. Dallas Morning News*, 22 S.W.3d 351, 357 (Tex. 2000). As such, statutory construction issues receive *de novo* review. *Dallas Co.*

9

*Community College Dist. v. Bolton*, 185 S.W.3d 868, 872 (Tex. 2004). Our primary objective when construing a statute is to ascertain and give effect to the Legislature's intent. *Id.* (citing *McIntyre v. Ramirez*, 109 S.W.3d 741, 745 (Tex. 2003)). To discern the Legislature's intent, we construe the statute's words according to their plain and common meaning; TEX. GOV'T CODE ANN. § 312.002 (WEST 2005); *Tex. Dept. of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 642 (Tex. 2004), unless a contrary intention is apparent from the context; *Taylor Firemen's & Policemen's Civil Serv. v. Comm'n*, 616 S.W.2d 187, 189 (Tex. 1981), or unless such a construction leads to an absurd result. *Barshop v. Medina County Underground Water Dist.*, 925 S.W.2d 618, 629 (Tex. 1996).

We construe administrative rules, which have the same force as statutes, in the same manner as statutes. *Rodriguez v. Service Lloyd's Ins. Co.*, 997 S.W.2d 248, 254 (Tex. 1999). "Serious consideration" is given to an agency's construction of a statute that it is charged with enforcing, particularly when the statute involves complex subject matter within the agency's area of expertise, so long as that construction is reasonable and consistent with the statutory language. *See First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 632 (Tex. 2008), *cert. denied*, 556 U.S. 1221, 129 S.Ct. 2157, 173 L.Ed.2d 1156 (2009). If a statute can be reasonably read as the enforcing agency has ruled, then courts are bound to accept that interpretation even if other reasonable interpretations exist. *See Southwestern Bell Tel. Co. v. Combs*, 270 S.W.3d 249, 260 (Tex.App.—Amarillo 2008, pet. denied). Further, we defer to an agency's interpretation of its own rule when the rule is vague or ambiguous, unless the administrative interpretation is "plainly erroneous or inconsistent with the regulation." *Service Lloyd's*

10

*Ins. Co.*, 997 S.W.2d at 254-55; *Gulf Coast Coalition of Cities v. Public Utility Com'n*, 161 S.W.3d 706, 712 (Tex.App.—Austin 2005, no pet.).

II.    "SALE AND/OR USE" VS. "SERVICE"

The sales tax is a transaction tax; *Bullock v. Delta Industrial Constr. Co.*, 668 S.W.2d 502, 504 (Tex.App.—Austin 1984, no writ) (citing *Calvert v. Canteen Co.*, 371 S.W.2d 556, 558 (Tex. 1963)), that is imposed on the sale of tangible personal property in this state. TEX. TAX CODE ANN. § 151.051(a) (WEST 2008). *See United Services Automobile Assoc. v. Strayhorn*, 124 S.W.3d 722, 730 (Tex.App.—Austin 2003, pet. denied). A use tax, on the other hand, is assessed when a party stores, uses or consumes a taxable item[3] within the state. TEX. TAX CODE ANN. § 151.101(a) (WEST 2008). The use tax is designed to complement the sales tax and applies to situations in which the taxing authority is unable to assess a sale tax because the purchase took place outside its taxing jurisdiction and the property purchased is stored or used within its jurisdiction. *Delta Industrial Const. Co.,* 668 S.W.2d at 504 (citing *Bullock v. Lone Star Gas Co.,* 567 S.W.2d 493, 497 (Tex.), *cert. denied*, 439 U.S. 985, 99 S.Ct. 577, 58 L.Ed.2d 657 (1978)). *See* 34 TEX. ADMIN. CODE § 3.346(b)(1) (1990).

A "sale" or "purchase" means a transfer of title or possession of tangible personal property and/or the performance of a taxable service when done or performed for consideration. TEX. TAX CODE ANN. § 151.005(1) (WEST 2008). "Tangible personal property" includes computer programs; TEX. TAX CODE ANN. § 151.009 (WEST 2008)., and a "computer program" is comprised of a series of instructions that are coded for

---

[3]A "taxable item" means tangible personal property and taxable services. TEX. TAX CODE ANN. § 151.010 (WEST 2008).

11

acceptance or use by a computer system and that are designed to permit the computer system to process data and provide results and information. Further, the sale or use of a taxable item such as a computer program in electronic form instead of on physical media does not alter the item's taxable status. TEX. TAX CODE ANN. § 151.010 (WEST 2008).

"Use" means "the exercise of a right or power incidental to the ownership of tangible personal property . . . ." TEX. TAX CODE ANN. § 151.011(a) (WEST 2008). The term "storage" means "[t]he keeping or retention of tangible personal property in Texas for any purpose other than . . . transporting property out of state to a location outside Texas for use *solely* outside of Texas." 34 TEX. ADMIN. CODE § 3.346(a)(1)(A) (1990) (emphasis added). *See also* TEX. TAX CODE ANN. § 151.011(f)(1) (WEST 2008). There is a presumption that tangible personal property delivered, shipped or brought into Texas is purchased for storage, use or consumption within Texas. TEX. TAX CODE ANN. §§ 151.105(a) & 151.104(a) (WEST 2008). *See* 34 TEX. ADMIN. CODE § 3.346(e) (1990). Further, the use tax is imposed at the same rate the sale tax would have been imposed on a similar in-state purchase and is assessed based on the item's sales price. TEX. TAX CODE ANN. § 151.101(b) (WEST 2008).

In sum, a computer program is tangible personal property subject to sales tax when the computer program is transferred or possessed in electronic form or on physical media for consideration; *see* TEX. TAX CODE ANN. §§ 151.005 & 151.051 (WEST 2008), or subject to use tax if the computer program is stored, used, and/or consumed in this state. *See* TEX. TAX CODE ANN. § 151.102 (WEST 2008).

The evidence at trial established that Verizon entered into purchase orders with vendors to purchase feature enhancements to enhance the performance of operating software programs on its digital switches. It subsequently contracted with vendors through purchase orders to develop and deliver the feature enhancements made to its specifications in return for lump sum payments. To create the feature enhancements, vendors re-wrote some code in the existing operating software and created new code that produced new and/or modified computer software programs or feature enhancements. The feature enhancements were incorporated into software loads comprised of the new feature enhancement and the original operating software that was already loaded in the switches. The software loads were first shipped to Richardson, Texas, where they were tested to determine whether they met the contract's specifications. The software load also underwent a comparison test to assure that the software load installed at the switches matched the master program. Thereafter, the master program remained throughout the refund period on Verizon's equipment in Richardson, Texas, to troubleshoot or provide technical support for its network if problems occurred involving the feature enhancement.

Pursuant to the purchase agreements and invoices, a substantial amount of the purchase price for the feature enhancements was paid either before or shortly after testing at the Richardson Laboratory. Contrary to Verizon's position, neither the purchase agreements nor the purchase orders required Verizon's vendors to be paid only after the software load had undergone field testing or was installed in the individual switches. Under the purchase agreement, installation was provided by the vendors at no additional charge, i.e., installation was part of the lump sum consideration paid for

the purchase of the feature enhancement. Thus, we find that the vendors sold their feature enhancement, a computer program or tangible personal property, to Verizon in Texas because Verizon took possession of the feature enhancement in Texas and most, if not all, of the consideration was paid when the feature enhancement was successfully tested and determined to be capable of carrying revenue producing or switch traffic.

Alternatively, even if we were to construe the sale of the feature enhancement as occurring out of state, the feature enhancements were "used" in Texas because the software programs were first shipped to the Richardson Laboratory, where they were tested before being copied and installed on the digital switches. Furthermore, the programs remained on the Laboratory's testbed to permit troubleshooting and technical support. *See* Comptroller of Public Accounts, Hearing No. 44,127, STAR Accession No. 200511437H (July 8, 2005) (computer software program installed on claimant's server in Texas that remained on server during entire refund period constituted a "use" and "storage" even though ultimate users would be located inside and outside Texas); Comptroller of Public Accounts, Hearing No. 36,957, STAR Accession No. 9912159H (December 20, 1999) (entire lump sum purchase price taxable where software tested in Texas even though one of the programs was shipped out of state for installation and use elsewhere). *See also* Comptroller of Public Accounts, Hearing No.32,619, STAR Accession No. 9508H1366C05 (August 25, 1995) (where refrigeration units were tested in Texas to see if they were working correctly before being shipped out of state,

14

refrigeration units were used in Texas and subject to sales tax because they were operated to test their performance in Texas).[4]

Verizon maintains there was no "sale" or "use" of the feature enhancements in Texas before their installation in the digital switches because it was purchasing a "service," i.e., the feature enhancements were purchased as "maintenance" or "remodeling" of existing software.  The Comptroller defines "maintenance" as "[a]ll work on operational and functioning tangible personal property necessary to sustain or support safe, efficient, continuous operations, or to keep in good working order by preventing the decline, failure, lapse, or deterioration of tangible personal property."  34 TEX. ADMIN. CODE § 3.292(a)(3) (2006).  "Remodel" is defined as "[t]o modify the style, shape, or form of tangible personal property belonging to another without causing a loss of its identity or without causing the item to operate in a new and different manner."  *Id.* at (a)(5).  Under the Tax Code, the Comptroller has exclusive jurisdiction to interpret the statute defining "taxable service."  *See* TEX. TAX CODE ANN. § 151.0101(b) (WEST 2008).

Therefore, by statutory definition, computer program "maintenance" means providing "error correction, improvements, or technical support."  *See* 34 TEX. ADMIN. CODE § 3.308(b)(3) (1987).  Although Verizon asserts that portions of the invoices represent charges for "error correction," its witnesses could not testify to a single entry in the invoices as being indicative of "error correction."   Therefore, the crux of Verizon's assertion is its contention that the term "improvement" includes any modification of a

---

[4]The State Tax Automated Research (STAR) System may be accessed at: http://www.window.state.tx.us/taxinfo/sales/.

software program that has been installed in an operating system. We believe Verizon reads too much into this simple word.

Under section 3.292, "maintenance" means to "sustain or support safe, efficient, continuous operations, or to keep in good working order by preventing the decline, failure, lapse, or deterioration of tangible personal property." 34 TEX. ADMIN. CODE § 3.292(a)(3) (2006) (emphasis added). The definitions in section 3.292 apply when used in section 3.308, unless the context clearly indicates otherwise. 34 TEX. ADMIN. CODE § 3.292 (2006). Here, we find that the context does not appear otherwise. Thus, when sections 3.292 and 3.308 are read together, computer program maintenance means providing error correction, improvements, or technical support to sustain or support the computer program's efficient and continuous operations, or to keep the computer program in good working order by preventing the decline, failure, lapse, or deterioration of the computer program. Viewed through this lens, then, it is apparent that any maintenance performed to maintain the original software operating system at the capacity at which it performed when initially loaded on the digital switches would be an "improvement" or "make better" the original operating software system because it would keep the original software system in good working order or sustain and support its efficient, continuous operation. Accordingly, we hold that, so long as a change to a software program does no more than keep the existing software operating system functioning at its original capacity before the change and does not alter the operating system's specifications existing prior to the installation of the new software program, the change is "maintenance." However, if the new software program alters the operating system's original capacity for operating or its specifications existing prior to installation

16

of the new software program, as it did here, then the installation of the new software program brings a new functionality to the operating system and is subject to sale and use tax provided the purchase satisfies the remaining statutory requirements. *See generally* Comptroller of Public Accounts, Hearing No. 35,100, STAR Accession No. 9707575H (July 3, 1997).

In making our determination, we also look to the primary purpose or "essence" of the contracts to determine whether the transaction between Verizon and its vendors was a sale of tangible personal property rather than a service. *See Combs v. Chevron, Inc.*, 319 S.W.3d 836, 842 (Tex.App.—Austin 2010, writ denied); *Sharp v. Direct Resources of Print, Inc.*, 910 S.W.2d 535, 538 (Tex.App.—Austin 1995, pet. denied) ("The established test for determining whether a transaction is subject to sales tax involves a determination of the ultimate object or the essence of the transaction.") "If the real object of a mixed transaction is the purchase of equipment which is taxable, and the service element is incident to that purchase, the entire transaction is taxable." *Rylander v. San Antonio SMSA Ltd., P'ship*, 11 S.W.3d 484, 487 (Tex.App.—Austin 2002, no pet.). "On the other hand, if the essence of the transaction is the purchase of a nontaxable service, which incidentally includes the purchase of some other service or equipment that is taxable, the entire transaction is nontaxable." *Id.* (citations omitted).

We think it indisputable that the essence of Verizon's contracts to purchase feature enhancements was the purchase of the computer software program itself, not the attendant services such as engineering by a software development team, installation, or maintenance. The ultimate goal of the transactions was to produce a master software load that could be loaded trouble-free at the vendor's switches and

then used to compare to the copies of the software loads that had been installed at the switches. The master software load then would be maintained indefinitely at the Richardson Laboratory to troubleshoot any issues that might develop in the future. "To put it another way, [Verizon] would (if possible) have gladly used the [feature enhancement] without purchasing the attendant services." *Chevron, Inc.*, 319 S.W.3d at 842. "On the other hand, the attendant services would have been useless to [Verizon] without the ability to use the [feature enhancements] to [enhance the attributes of the switches with a new functionality]*." Id. See also Austin Engineering Co., Inc. v. Combs*, No. 03-10-00323-CV, 2011 Tex. App. LEXIS 6122, at *8-12 (Tex.App.—Austin 2011, no pet.) (mem. op.).

Further, we find that any service or maintenance performed pursuant to the purchase agreements in connection with the sale of the feature enhancements, whether the service was supplied through installation of the software loads or cost-free maintenance provided during the warranty period, was incidental and, as such, is included in the sale price of the feature enhancement. *See* 34 TEX. ADMIN. CODE § 3.308(b)(1) (1987) ("A completed program includes any modification, installation, or maintenance charges made in connection with the sale of the program.") Verizon has offered no evidence of any additional maintenance contracts or extended warranties beyond the maintenance/warranty services performed by the vendors under the purchase agreements. In this respect, Verizon failed to meet its burden of proof. *See* Comptroller of Public Accounts, Hearing No. 43,240, STAR Accession No. 20055121526H (December 22, 2005) (to prove maintenance services were performed,

18

petitioner should provide a copy of the maintenance service agreement or other documentation).

Verizon also asserts that the definition of "maintenance" in section 3.308 is broad enough to cover "remodeling" because the definition includes "improvements." Verizon contends that when a computer programmer modifies software code, the programmer is "remodeling" the software. Verizon cites no legal authority under the Tax Code in support of its assertion that the term "remodeling" applies to computer software. Although section 3.308 refers to "remodeling," it does so only in the context of computer hardware. 34 TEX. ADMIN. CODE § 3.308(a)(4) (1987). Under that portion of section 3.308 specifically addressing computer software, there is no mention of "remodeling." *See* 34 TEX. ADMIN. CODE § 3.308(b)(1)-(3) (1987). Neither is there any evidence of record that the term "remodeling" is used in the computer industry to refer to computer software development. In fact, Mark Nicholson, a member of Verizon's technical staff and one of its expert witnesses, testified that, before this suit, he never spoke with a vendor about "remodeling" their software and stated "remodeling" was not a common term in the industry. Thus, Verizon simply supplies no basis in law or in fact to apply the term remodeling to computer software. Accordingly, we find that the term "remodeling" in section 3.308 does not apply to computer software. *See Meritor Automotive, Inc. v. Ruan Leasing Co.*, 44 S.W.3d 86, 90 (Tex. 2001) ("Ordinarily when the Legislature has used a term in one section of a statute and excluded it in another, we will not imply the term where it has been excluded."); *Fireman's Fund Co. Mutual Ins. Co. v. Hidi*, 13 S.W.3d 767, 769 (Tex. 2000) ("When the Legislature has employed a term in one section of a statute and excluded it in another, we presume that the Legislature had a

reason for excluding it.")  However, even if, we were to determine that the term did apply, and we do not, we would find that the record contains sufficient evidence in support of the trial court's finding that the feature enhancements caused the operating software of the switches as it existed prior to the feature enhancements' installation to operate in a "new" or "different manner" to defeat Verizon's legal and factual insufficiency claims.

Verizon also asserts that no "sale" occurred because the feature enhancements were not "completed programs."  The Comptroller's definition of a "computer program" tracks the statutory definition but also requires that the series of instructions be sold as a "completed program."  34 TEX. ADMIN. CODE § 3.308(b)(1) (1987).  A "completed program" includes any modification, installation,[5] or maintenance charges made in connection with the sale of a computer program and "the combining of several existing program modules into a new program will be considered the sale of a completed program."  *Id.*  Because the software loads contained the original operating software as well as the new feature enhancement, we find that the new feature enhancements were sold as a complete program.  The new software load operated as one application with the original operating software.  As such, Verizon successfully tested and installed a complete operating system in the Laboratory containing the switches' original operating software combined with the feature enhancements.  Nicholson further testified that a "[c]omputer program and software are one and the same.  Software load is one application because it must operate as one."  Moreover, without the addition of the

---

[5]"Sales tax is due on the sale, lease *or* license of a computer program" and "[c]harges for the installation of the program are taxable whether or not separately stated."  34 TEX. ADMIN. CODE § 3.308(b)(2) (1987).

feature enhancement's new functionality, the original operating software would have operated as originally installed without the change purchased by Verizon through the new software program.

Verizon also contends the trial court erred in paragraph 6 of its *Findings of Fact* by finding that "[Verizon] paid sales and use tax on the purchase of a single license to use computer software described as feature enhancements to existing software" and asserts that, because the original license purchased with the digital switches encompassed any future feature enhancements, there was no transfer of tangible personal property when the feature enhancements were purchased by Verizon. Having found there was a "sale" of the feature enhancements by the vendors to Verizon during the refund period, we need not consider whether a license was also a part of that sale. *See* 34 TEX. ADMIN. CODE § 3.308(b)(2) (1987) ("Sales tax is due on the sale, lease *or* license of a computer program." [Emphasis added] Moreover, the purchase agreements indicate that the single license purchased for the original operating software on the switches also encompassed the new feature enhancements purchased during the refund period.

In sum, having reviewed the entire record, we find there is more than a scintilla of evidence supporting the trial court's judgment that the feature enhancements or software loads purchased by Verizon during the refund period are taxable under the sales tax and, alternatively, the use tax. We also find that the trial court's judgment is not so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. In doing so, we rely upon the trial court who observed the witnesses first hand, judged their credibility and assigned the weight given to their testimony.

III.    SALES TAX EXEMPTION

Verizon asserts that it is entitled to a partial refund because the feature enhancements were installed on digital switches outside of Texas.  In support, Verizon contends that the copies of the software loads are not subject to Texas sales tax because the copies were not delivered to Verizon in Texas but installed on Verizon's digital switches outside of Texas, there was no separate charge to Verizon for the Richardson Laboratory's test software and the software loads were not "accepted" until they were installed on each individual switch and working properly on Verizon's network.

It is a long-standing rule that exemptions from taxation are subject to strict construction because they place a greater burden on other tax-paying businesses and individuals rather than placing the burden on all taxpayers equally. *Southwestern Bell*, 270 S.W.3d at 263 (citing *Cordilera Ranch, Ltd. V. Kendall County Appraisal Dist.*, 136 S.W.3d 249, 253-54 (Tex.App.—San Antonio 2004, no pet.)).  As such, exemptions cannot be raised by implication; *Bullock v. National Bancshares Corp.*, 584 S.W.2d 268, 272 (Tex. 1979), *cert. denied*, 444 U.S. 1016, 100 S.Ct. 667, 62 L.Ed.2d 645 (1980), must affirmatively appear, and all doubts are resolved in favor of the taxing authority and against the claimant.  *Id.*  The burden of proof is on the person claiming the exemption to clearly show that it comes within the statutory exemption; *id.*; *USA Waste Services of Houston, Inc. v. Strayhorn*, 150 S.W.3d 491, 495 (Tex.App.—Austin 2004, no pet.), and, although we are not bound by the Comptroller's interpretation, the Comptroller's administrative interpretation of ambiguous language in a revenue statute is entitled to our respect and due weight.  *Southwestern Bell*, 270 S.W.3d at 263.

Under the Tax Code, "[a] tax is imposed on each sale of a taxable item in this state." TEX. TAX CODE ANN. § 151.051(a) (WEST 2008). "Sale" means the transfer of title or possession of tangible personal property when done or performed for consideration; TEX. TAX CODE ANN. § 151.005(1) (WEST 2008), and the "sales price" means "the total amount for which a taxable item is sold . . . valued in money." § 151.007(a) (WEST 2008). The sales tax rate is 6.25 percent "of the sales price of the taxable item sold." TEX. TAX CODE ANN. § 151.051(b) (WEST 2008). Thus, per the Tax Code, we find that the feature enhancements were sold for a lump sum price and the total lump sum price paid for the feature enhancements is subject to the Texas sales tax.

Verizon cites to no statutory provision of the Tax Code that permits the apportionment of the sales price of the feature enhancements to digital switch locations outside Texas. Rather, Verizon seeks an exemption for "[t]he sale of tangible personal property that under the sales contract is shipped to a point outside this state . . . . " TEX. TAX CODE ANN. § 151.330(a) (WEST 2008). Here, however, neither the purchase agreements, the purchase orders, nor the invoices required the feature enhancements to be shipped to switch locations outside of Texas. Rather, under the purchase agreements, delivery meant receipt of any system or software at the F.O.B. destination specified in the purchase order. The purchase orders for the feature enhancements specify that the software programs be shipped to Richardson, Texas and, in a number of cases, indicate that the "[f]inal [d]estination" is Richardson, Texas. With but a few exceptions, the invoices also indicate that the feature enhancements were first shipped by vendors to the Richardson Laboratory and many of the invoices for DSC/Alcatel and

23

Nortel contained the following notations: "Install at Lab Richardson," "SITE: Richardson" and "Destination: Richardson, TX."

Neither does Verizon cite to any statutory provision related to the use tax that permits apportionment. As noted earlier, under the Tax Code, neither "use" nor "storage" include the exercise of a right or power over tangible personal property for the purpose of transporting the property outside the state for use solely outside the state. TEX. TAX CODE ANN. § 151.011(f)(1) (WEST 2008). Here, however, the master software loads were first shipped to Texas, tested in Texas for verification that the software met contract specifications, comparison tested, and retained in Texas to troubleshoot or resolve future problems, if any. As such, the master software loads were not used solely outside Texas and the exemption is inapplicable. *See* Comptroller's Decision No. 36,957, STAR Accession No. 9912159H (1999); Comptroller's Decision No. 32,619, STAR Accession No. 9508H1366C05 (1995).

Under the purchase agreements, the testing equipment delivered to the Richardson Laboratory by the vendors was additional consideration for the lump sum price Verizon paid for the feature enhancements, i.e., Verizon's payment to the vendor was conditioned on software loads being tested and meeting Verizon's specifications. Further, as noted earlier, the purchase agreements provided for acceptance prior to their installation on Verizon's out-of-state switches and the invoices indicate that most, if not all, of the purchase price for the software loads was paid before copies were made of the master program and sent to the switches. As we indicated earlier, the "deliverable" sought by Verizon was a master computer program containing the existing operating software on the switches and the new feature enhancement that could be

24

copied and loaded onto the switches without the occurrence of any glitches in Verizon's nationwide network. Thereafter, the master program was maintained at the Laboratory to troubleshoot issues, if any, and provide technical support.

Verizon also relies on deposition excerpts of Jeffrey A. Saltzberg for the proposition that acceptance occurred when the feature enhancements were loaded on the out-of-state switches and successfully operated within Verizon's network. Saltzberg testified that he relied upon a statement by Verizon's head at the switch Laboratory for this information. The deposition excerpts do not explain where Saltzberg is employed, nor his connection with Verizon's refund claim. The Verizon employee relied upon by Saltzberg for this information is not named, does not identify any specific time frame or software load and gives no explanation regarding how he came by this information. As such, '[i]n legal contemplation, there [is] no evidence to support [a finding that acceptance occurred at the switches], even if th[is] inadmissible evidence be given probative force." *Barstow v. County of Travis*, 742 S.W.2d 495, 502 (Tex.App.—Austin 1987, writ denied) (where witness testified county maintained road although he had no personal knowledge and his information came from a telephone conversation with a county employee, there was no evidence county maintained road). Accordingly, Verizon's first and second issues are overruled.

III.    INTEREST

The trial court refunded Verizon $1,507,649.45 for taxes unlawfully assessed during the refund period. Verizon contends the trial court erred by not including language in the judgment requiring the Comptroller to refund interest on delinquent tax

25

assessed by the Comptroller during the refund period by an amount equal to interest on $1,507,649.45. Verizon cites provisions of Chapter 112 of the Tax Code wherein taxpayers are permitted to bring taxpayer refund suits against the Comptroller for the amount of the refund plus interest; TEX. TAX CODE ANN. §§ 112.151(a) & 112.002 (WEST SUPP. 2012 and WEST 2008), but also cites a provision of Chapter 111 of the Tax Code as authority for the request to refund the interest paid on the $1,507,649.45 while the tax was considered delinquent by the Comptroller. *See* TEX. TAX CODE ANN. § 111.104(a) (WEST 2008).

Because this issue was not raised in Verizon's *Motion For Rehearing* before the Comptroller during its administrative claim for a refund under Chapter 111 of the Tax Code, it is precluded from doing so here. *See* TEX. TAX CODE ANN. § 112.152(a) (WEST 2008) ("The grounds of error contained in the motion for rehearing are the only issues that may be raised in a suit under this subchapter.") *See also Chevron, Inc.*, 319 S.W.3d at 844-45. That said, we also find that the trial court's judgment conforms to Chapter 112, Subchapter D, of the Tax Code; see TEX. TAX CODE ANN. §§ 112.151 & 112.155 (WEST SUPP. 2012 and WEST 2008), and the trial court committed no error. Verizon's third issue is overruled.

CONCLUSION

The trial court's judgment is affirmed.

Patrick A. Pirtle
Justice

26