# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-17-00061-CV

**Appellant, Silicon Laboratories, Inc. // Cross-Appellants, Glenn Hegar, Comptroller of Public Accounts of the State of Texas; and Ken Paxton, Attorney General of the State of Texas**

**v.**

**Appellees, Glenn Hegar, Comptroller of Public Accounts of the State of Texas; and Ken Paxton, Attorney General of the State of Texas // Cross-Appellee, Silicon Laboratories, Inc.**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT NO. D-1-GN-15-000302, HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Silicon Laboratories, Inc. (Silicon Labs) appeals the portion of the trial court's judgment following a bench trial that denied its refund claim for sales and use taxes that it paid on the purchase of Electronic Design Automation (EDA) software tools for the tax period May 1, 2003, to October 31, 2006.[1] Silicon Labs claimed that the EDA software tools were exempt from the sales and use tax because they fell within the manufacturing exemption. *See* Tex. Tax Code § 151.318

---

[1] The trial court granted Silicon Labs' refund claim for sales and use taxes that it paid on the purchase of memory elements, and the Comptroller of Public Accounts and the Attorney General have not appealed that ruling. The trial court concluded that the purchase of the memory elements fell within the sale-for-resale exemption in sections 151.006 and 151.302 of the Texas Tax Code. *See* Tex. Tax Code §§ 151.006 (defining "sale for resale"), .302 (exempting "sale for resale of a taxable item" from taxes imposed by chapter).

(generally exempting property used in manufacturing from taxes imposed by chapter).  The Comptroller of Public Accounts and the Attorney General[2] cross appeal in the alternative, challenging the trial court's jurisdiction over particular arguments made by Silicon Labs to support its refund claims.  For the following reasons, we affirm the trial court's final judgment.

## Background

**Manufacturing Exemption**

To give context to the parties' dispute, we begin with a brief overview of the manufacturing exemption, one of the exceptions to the general rule that sales tax is imposed on any "sale" of a "taxable item" in the state.  *See* Tex. Tax Code §§ 151.051 (stating general rule that "tax is imposed on each sale of a taxable item in this state"), 151.318 (manufacturing exemption).  In general terms, "[t]he manufacturing exemption exempts a person who produces certain types of tangible personal property for sale to ultimate consumers from having to pay sales tax on its purchase of certain otherwise-taxable tangible personal property that is used in the production process." *Combs v. Home & Garden Party, Ltd.*, No. 03-09-00673-CV, 2010 Tex. App. LEXIS 8875, at *7 (Tex. App.—Austin Nov. 3, 2010, no pet.) (mem. op.); *see GTE Sw. Inc. v. Combs*, No. 03-08-00561-CV, 2010 Tex. App. LEXIS 4223, at *7–9 (Tex. App.—Austin June 3, 2010, pet. denied) (mem. op.) (generally describing manufacturing exemption).  The manufacturing exemption serves "to avoid pyramiding the sales tax on successive buyers and sellers, which would result in the ultimate consumer paying sales tax on sales tax." *Sharp v. Tyler Pipe Indus., Inc.*, 919 S.W.2d 157,

---

[2] Unless otherwise stated, we refer to the Comptroller of Public Accounts and the Attorney General collectively as the Comptroller.

161 (Tex. App.—Austin 1996, writ denied). The exemption is also intended "to encourage economic development in this state" and "to strike a balance between the policy of avoiding multiple taxation and the need to raise revenue for the state." *Id.*

Relevant to the parties' dispute, subsection (a)(2) of section 151.318 provides:

(a)     The following items are exempted from the taxes imposed by this chapter if sold, leased, or rented to, or stored, used, or consumed by a manufacturer:

. . .

(2)     tangible personal property directly used or consumed in or during the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale if the use or consumption of the property is necessary or essential to the manufacturing, processing, or fabrication operation and directly makes or causes a chemical or physical change to:

(A)     the product being manufactured, processed, or fabricated for ultimate sale; or

(B)     any intermediate or preliminary product that will become an ingredient or component part of the product being manufactured, processed, or fabricated for ultimate sale; . . . .

Tex. Tax Code § 151.318(a)(2). Although section 151.318 does not define "manufacturer," Comptroller Rule 3.300(a)(8) provides that a manufacturer is "[a] person who is engaged in manufacturing" and that the term includes "processors, fabricators, submanufacturers, and custom manufacturers." 34 Tex. Admin. Code § 3.300(a)(8) (Comptroller of Pub. Accounts, Manufacturing; Custom Manufacturing; Fabricating; Processing (Tax Code, §§ 151.005, 151.007, 151.318, and 151.3181)).

3

Also relevant to the parties' dispute, subsection (b)(2) of section 151.318 expressly provides that the manufacturing exemption includes "semiconductor fabrication cleanrooms and equipment." Tex. Tax Code § 151.318(b). For purposes of subsection (b), "semiconductor fabrication cleanrooms and equipment" means:

> all tangible personal property, without regard to whether the property is affixed to or incorporated into realty, used in connection with the manufacturing, processing, or fabrication in a cleanroom environment of a semiconductor product, without regard to whether the property is actually contained in the cleanroom environment. The term includes integrated systems, fixtures, and piping, all property necessary or adapted to reduce contamination or to control airflow, temperature, humidity, chemical purity, or other environmental conditions or manufacturing tolerances, and production equipment and machinery. The term does not include the building or a permanent, nonremovable component of the building, that houses the cleanroom environment. The term includes moveable cleanroom partitions and cleanroom lighting. "Semiconductor fabrication cleanrooms and equipment" are not "intraplant transportation equipment" as that term is used in Subsection (c)(1).

*Id.* § 151.318(q). The "limitations in subsection (a)(2) that refer to tangible personal property directly causing chemical and physical changes to the product being manufactured, processed, or fabricated for ultimate sale" do not apply to "semiconductor fabrication cleanrooms and equipment." *Id*. § 151.318(s)(1).

For purposes of the manufacturing exemption, "'manufacturing' includes each operation beginning with the first stage in the production of tangible personal property and ending with the completion of tangible personal property having the physical properties (including packaging, if any) that it has when transferred from the manufacturer to another." *Id.* § 151.318(d); *see* 34 Tex. Admin. Code § 3.300(a)(9) (defining "manufacturing" and explaining that "first production stage means the first act of production, and it shall not include those acts in preparation

4

of production"). And "the manufacturing of computer software begins with the design and writing of the code or program for the software and includes the testing or demonstration of the software." Tex. Tax Code § 151.318(p); *see* 34 Tex. Admin. Code § 3.300(a)(9).

The taxpayer claiming the manufacturing exemption under section 151.318 has the "burden of proof that the exemption is applicable and that no exclusion under Subsection (c) applies." Tex. Tax Code § 151.318(r); 34 Tex. Admin. Code § 3.300(j); *see GTE Sw. Inc.*, 2010 Tex. App. LEXIS 4223, at *6. The exclusions to the exemption in subsection (c) include "research or development of new products." Tex. Tax Code § 151.318(c)(3).

**The Parties' Dispute[3]**

The parties' dispute concerns the EDA software tools that Silicon Labs purchases and uses to design and develop "mixed signal" semiconductor chips that it sells for use in a broad range of applications including electronic products such as mobile phones and gaming consoles.[4] Silicon Labs uses the EDA software tools to design and develop semiconductor chips in a virtual environment and then contracts with a third-party foundry in Taiwan for the actual manufacturing and fabrication of the semiconductor chips. The foundry provides a "Process Design Kit" to Silicon Labs that specifies the foundry's manufacturing tolerances, and Silicon Labs then uses EDA software tools to design and develop the semiconductor chips in a virtual environment within the foundry's

---

[3] The factual background of the parties' dispute primarily is taken from the trial court's unchallenged findings of fact.

[4] A mixed signal chip incorporates analog and digital processing onto the same integrated circuit. Analog signals, such as sound and radio waves, are converted into digital signals that the electronic products can process.

5

specified manufacturing tolerances. Among the components of the semiconductor chips are "logic gates" which are etched or embedded within the chips' silicon substrate. A collection of these logic gates implements "functional logic"—a series of instructions or logical operations within the semiconductor chip.

The EDA software tools include tools that aid in: (i) generating an electric design schematic representing the entire chip, (ii) transforming the electric design schematic into a physical layout of how the various electric devices will be physically positioned on the chip, (iii) verifying that the physical layout is an accurate description of the electric design schematic (the layout versus schematic (LVS) check), (iv) verifying that all physical dimensions within the physical layout meet the foundry's design rules (the design rule check (DRC)), (v) creating the functional logic in a virtual environment (the Verilog EDA tool), (vi) designing and placing the electrical connections and integrating the chip's various components, and (vii) verifying through simulation that the integrated circuits of the chip will operate properly.

After Silicon Labs completes the semiconductor chip's design using the EDA software tools, it creates and transmits electronically to the third-party foundry a graphic design system (the "GDS" file) "describing a set of photolithography masks" that the foundry fabricates and then uses to fabricate the semiconductor chips. The masks are used to pattern some of the layers of the silicon substrate, or "wafer," and then are cut into smaller pieces or "chips." The chips are placed in a package, which has a number of connection points, or "pins," that provide electrical connections between the packaged semiconductor chip and external circuits or components. The foundry performs its own DRC using its own EDA software tools that it purchased before initiating

6

actual production of the semiconductor chips. The EDA software tools that Silicon Labs purchased are not used by the third-party foundry in its manufacturing process.

**The Refund Claims**

The Comptroller audited Silicon Labs' sales and use tax records for the period May 1, 2003, to October 31, 2006 (the audit period) and concluded that Silicon Labs owed sales taxes on its purchases of the EDA software tools during the audit period. Following the audit, Silicon Labs requested a redetermination hearing, which was assigned Hearing No. 102,151. Silicon Labs also filed a separate refund claim for the same audit period and requested a refund hearing, which was assigned Hearing No. 101,320. Both claims concerned the EDA software tools that Silicon Labs had purchased from various vendors during the audit period, and one of the grounds raised by Silicon Labs to support its refund claims was that the EDA software tools qualified for the manufacturing exemption provided in section 151.318 of the Tax Code. *See* Tex. Tax Code § 151.318. The substance of both claims was addressed in Hearing No. 102,151. After the Comptroller denied the claims in Hearing No. 102,151, Silicon Labs filed a motion for rehearing, which was denied. Silicon Labs then filed suit in Travis County District Court from the Comptroller's decision in Hearing No. 102,151.

After Silicon Labs filed suit, the parties filed an agreed motion to dismiss Hearing No. 101,320 to allow Silicon Labs to proceed to district court on that claim as well, stating that "the substantive tax issues addressed in Hearing No. 102,151 are applicable to the issues addressed in this hearing" and that the parties agreed that dismissal was appropriate in order for Silicon Labs "to pursue its case in Travis County District Court pursuant to Chapter 112 of the Texas Tax Code by

7

joining with [its] pending lawsuit that addresse[d] the tax issues in Hearing No. 102,151." The Comptroller entered a written decision dismissing Hearing No. 101,320 in accordance with the parties' agreement, and Silicon Labs filed a motion for rehearing, which was also denied. Silicon Labs then filed a separate suit from the Comptroller's decision in Hearing No. 101,320.

The suits challenging the Comptroller's decisions in Hearing Nos. 102,151 and 101,320 were consolidated and then tried to the trial court in 2016. The parties stipulated to the amount of taxes at issue and submitted documentary evidence, including the "Silabs Chip Fabrication Agreement" between Silicon Labs and the third-party foundry in Taiwan. Silicon Labs' witnesses were two of its employees, a senior director of design and the vice president of central engineering, and the Comptroller's witness was an expert in the design and manufacturing of semiconductor chips. The facts were largely undisputed. The witnesses testified about the design and manufacture of the semiconductor chips by Silicon Labs and the third-party foundry inTaiwan, the components of the chips, the different EDA software tools that Silicon Labs used, the role of those tools in the design and manufacture of the chips, and the division of work between Silicon Labs and the third-party foundry to produce the semiconductor chips. The witnesses' testimony was consistent that the EDA software tools at issue were necessary to design and produce the semiconductor chips sold by Silicon Labs, and that the third-party foundry did not use the EDA software tools that Silicon Labs had purchased but its own in its manufacturing process.

Following the bench trial, the trial court entered judgment in favor of the Comptroller as to Silicon Labs' request for a tax refund on Silicon Labs' purchases of the EDA software tools.[5] The trial court also entered findings of fact and conclusions of law. Silicon Labs filed a motion for new trial, which was overruled by operation of law. These cross-appeals followed.

## Analysis

### Standard of Review

In an appeal from a bench trial, we review a trial court's conclusions of law de novo, affirming the judgment on any legal theory that finds support in the evidence. *See BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002); *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990). "[W]e will not reverse an erroneous conclusion if the trial court rendered the proper judgment." *City of Austin v. Whittington*, 384 S.W.3d 766, 779 n.10 (Tex. 2012); *see Marchand*, 83 S.W.3d at 794.

We review a trial court's findings of fact for legal and factual sufficiency of the evidence by the same standards applied to a jury verdict. *See Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996); *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991); *see City of Keller v. Wilson*, 168 S.W.3d 802, 827–28 (Tex. 2005) (describing legal sufficiency standard of review); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (describing factual sufficiency standard of review). When findings of fact are filed and unchallenged, "they are binding on an appellate court unless the

---

[5] As previously stated, the trial court found in Silicon Labs' favor on its claim as to its purchases of memory elements, and the Comptroller has not appealed that ruling.

contrary is established as a matter of law, or if there is no evidence to support the finding." *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986).

The parties' issues also address statutory and rule construction, questions of law that we review de novo. *See First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 631 (Tex. 2008); *see Rodriguez v. Service Lloyds Ins. Co.*, 997 S.W.2d 248, 254 (Tex. 1999) (construing administrative rules in same manner as statutes). Our primary concern in construing a statute is the express statutory language. *See Galbraith Eng'g Consultants, Inc. v. Pochucha*, 290 S.W.3d 863, 867 (Tex. 2009). "We thus construe the text according to its plain and common meaning unless a contrary intention is apparent from the context or unless such a construction leads to absurd results." *Presidio Indep. Sch. Dist. v. Scott*, 309 S.W.3d 927, 930 (Tex. 2010) (citing *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625–26 (Tex. 2008)). We also "read the statute as a whole and interpret it to give effect to every part." *Railroad Comm'n v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 628 (Tex. 2011) (quoting *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25 (Tex. 2003)). Further, a precondition to deference to an agency's interpretation of a statute is ambiguity. *Southwest Royalties, Inc. v. Hegar*, 500 S.W.3d 400, 404–05 (Tex. 2016); *see Combs v. Roark Amusement & Vending, L.P.*, 422 S.W.3d 632, 635 (Tex. 2013) (describing agency-deference doctrine); *Combs v. Health Care Servs. Corp.*, 401 S.W.3d 623, 629–30 (Tex. 2013) (same).

Statutory exemptions from taxation—like the manufacturing exemption—are strictly construed because "they undermine equality and uniformity by placing a greater burden on some taxpaying businesses and individuals rather than placing the burden on all taxpayers equally." *North*

10

*Alamo Water Supply Corp. v. Willacy Cty. Appraisal Dist.*, 804 S.W.2d 894, 899 (Tex. 1991). The claimant has the burden of proof to show that an exemption applies. *Id.* "An exemption must affirmatively appear in the statute, and all doubts are resolved in favor of the taxing authority." *GTE Sw. Inc.*, 2010 Tex. App. LEXIS 4223, at *6 (citing *Bullock v. National Bancshares Corp.*, 584 S.W.2d 268, 272 (Tex. 1979)); *see also Southwest Royalties Inc.*, 500 S.W.3d at 404 (explaining that tax exemptions are narrowly construed and that taxpayer has burden to "clearly show" that exemption applies). "On the other hand, the concept that a tax exemption must be 'strictly' construed 'cannot be used as an excuse to stray from reasonableness.'" *GTE Sw. Inc.*, 2010 Tex. App. LEXIS 4223, at *7 (citing *Tyler Pipe Indus., Inc.*, 919 S.W.2d at 161). And "the overall scheme and intent of the legislation must not be overlooked." *Tyler Pipe Indus., Inc.*, 919 S.W.2d at 161–62 (citation omitted). With the foregoing in mind, we turn to the parties' issues.

**Cross-Appeal by the Comptroller**

We begin with the jurisdictional issue raised by the Comptroller in the alternative on cross appeal. *See Crites v. Collins*, 284 S.W.3d 839, 840 (Tex. 2009) (determining jurisdictional questions before addressing merits); *Combs v. Chevron, Inc.*, 319 S.W.3d 836, 844 (Tex. App.—Austin 2010, pet. denied) (explaining that compliance with procedural requirements of tax protest law was jurisdictional prerequisite for trial court to hear and decide merits of tax refund suit).

The Comptroller argues that the trial court did not have jurisdiction over Silicon Labs' "cleanroom argument" that was based on subsections (b) and (q) of section 151.318 because Silicon Labs failed to make the argument prior to bringing its suit for judicial review, properly present it in a motion for rehearing, or properly raise it in its initial administrative refund request. To support its

11

position, the Comptroller relies on the fact that the motion for rehearing in No. 101,320—in which Silicon Labs specifically referenced subsections (b)(2) and (q) and argued that the EDA software tools were exempt from sales taxes under those subsections—was not filed until several months after the suit for judicial review in No. 102,151 was filed.

The Tax Code authorizes suits for tax refund claims but sets jurisdictional prerequisites for doing so. *See* Tex. Tax Code §§ 112.151 (requiring claimant to follow administrative procedures specified in sections 111.104 and 111.105 of Tax Code prior to bringing suit for tax refund claim), .152 (limiting issues in suit brought under subchapter to "grounds of error contained in the motion for rehearing"); *see also id*. §§ 111.104 (requiring written claim for refund to be filed with Comptroller), .105 (addressing hearing on tax refund claim and motion for rehearing requirement); *Chevron, Inc.*, 319 S.W.3d at 844. Section 111.004(c)(2) states that a claim for a refund must "state fully and in detail each reason or ground on which the claim is founded." Tex. Tax Code § 111.104(c); *Hegar v. Ryan, LLC*, No. 03-13-00400-CV, 2015 Tex. App. LEXIS 5096, at *25–28 (Tex. App.—Austin May 20, 2015, no pet.) (mem. op.) (concluding that section 111.104(c)(2) was not ambiguous, citing common meaning of "fully" and "detail," and interpreting plain language in context and conjunction with other sections of Tax Code that contain similar language). Subsection (c)(2)'s requirement ensures that the Comptroller is on notice of the legal basis of the claim. *See Ryan, LLC*, 2015 Tex. App. LEXIS 5096, at *28 (citing Court's interpretation of phrase "fully and in detail" in section 112.051 of the Tax Code "that the 'reason' must be stated in such a way as to put the comptroller on notice of the legal basis of the claim"); *see also* Tex. Tax Code § 112.051(b) (requiring written protest that is submitted with payment to "state fully and in

12

detail each reason for recovering the payment"). And section 111.105(d) of the Tax Code similarly states that "[a] motion for rehearing on a tax refund claim must be written and assert each specific ground of error." Tex. Tax Code § 111.105(d).

In the procedural context of these combined suits for refund claims, we conclude that the trial court had jurisdiction to consider Silicon Labs' arguments that were based on subsections (b)(2) and (q) of section 151.318. Silicon Labs specifically referenced the subsections in the motion for rehearing in Hearing No. 101,320, and Silicon Labs in its written grounds for refunds filed with the Comptroller specifically referenced the manufacturing exemption in section 151.318. *See Strayhorn v. Lexington Ins. Co.*, 128 S.W.3d 772, 779–81 (Tex. App.—Austin 2004), *aff'd*, 209 S.W.3d 83 (Tex. 2006) (analyzing protest letters in context of particular proceeding and concluding that Comptroller "was on notice of the legal bases for their claims" and that claimants had substantially met requirements of section 112.151); *cf. Chevron*, 319 S.W.3d at 845 (concluding that trial court lacked jurisdiction over unrelated claims that were first raised in motion for rehearing); *Local Neon Co. v. Strayhorn*, No. 03-04-00261-CV, 2005 Tex. App. LEXIS 4667, at *14–15 (Tex. App.—Austin June 16, 2005, no pet.) (mem. op.) (concluding that "bare statement" that paying taxes under protest did not satisfy "purpose of the written protest requirement because the letter does not inform the Comptroller on what basis she must defend the suit"); *see also Southwest Royalties, Inc. v. Combs*, 501 S.W.3d 95, 97 (Tex. App.—Austin 2014), *aff'd*, 500 S.W.3d 400 (Tex. 2016) (observing that claimant "asserted that it was entitled to an exemption under three subsections of the manufacturing exemption" when it sought tax refund). Thus, we overrule the Comptroller's jurisdictional argument on cross appeal and turn to Silicon Labs' appeal.

13

**Silicon Labs' Appeal**

Silicon Labs raises two issues on appeal. It argues that the trial court erred by ruling that the EDA software tools were not exempt from sales taxes pursuant to the manufacturing exemption under subsection (a)(2)(A) of section 151.318 and, in the alternative, that the "digital tools components" of the EDA software tools were exempt under subsection (a)(2)(B) of section 151.318. We address each in turn.

### Section 151.318(a)(2)(A)

In its first issue, Silicon Labs argues that it was exempt from paying sales tax on its purchases of the EDA software tools during the audit period pursuant to section 151.318(a)(2)(A). As previously stated, section 151.318(a)(2)(A) provides in relevant part that:

> The following items are exempted from the taxes imposed by this chapter if sold, leased, or rented to, or stored, used, or consumed by a manufacturer: . . . (2) tangible personal property directly used or consumed in or during the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale if the use or consumption of the property is necessary or essential to the manufacturing, processing, or fabrication operation and directly makes or causes a chemical or physical change to: (A) the product being manufactured, processed, or fabricated for ultimate sale.

Tex. Tax Code § 151.318(a)(2)(A).

We conclude that the applicable language of subsection(a)(2)(A) for purposes of this appeal is not ambiguous and, thus, interpret the text according to its common and plain meaning in the context of the framework of section 151.318. *See Scott*, 309 S.W.3d at 930. The statute does not define "actual" or "directly" so we apply their common meanings. *See Webster's Third New*

14

*International Dictionary* 22 (2002) (defining "actual" to mean "existing in fact or reality"), 641 (defining "directly" to mean "without any intervening space or time"); *see also Tyler Pipe Indus., Inc.*, 919 S.W.2d at 159–60, 162–63 (referring to common meaning of "actual" in analysis of former version of manufacturing exemption and discussing other courts' interpretation of "directly" in similar contexts).

Because "manufacturing" is defined by the statute and corresponding rule, we apply those definitions. *See Southwest Royalties, Inc.*, 500 S.W.3d at 406 (explaining that, "[a]lthough the Comptroller's definition is not binding, [courts] may consider it in determining the definition most consistent with the scheme of the statute"); *see also Southwest Royalties, Inc.*, 501 S.W.3d at 104 (discussing definition of "manufacturing" under section 151.318(d)). Under the definition provided in the statute, the term "includes each operation beginning with the first stage in the production of tangible personal property and ending with the completion of tangible personal property having the physical properties (including packaging, if any) that it has when transferred by the manufacturer to another." Tex. Tax Code § 151.318(d); *see also Webster's* at 1581 (defining "operation" as "a doing or performing esp. of action: work, deed"). Pursuant to the corresponding rule, "[t]he first production stage means the first act of production, and it shall not include those acts in preparation for production." 34 Tex. Admin. Code § 3.300(a)(9) (defining "manufacturing").

The plain language of subsection (a)(2)(A) requires that the use of the property cause a direct "chemical or physical change" and "is necessary or essential" to the manufacturing operation, as well as requiring that the tangible personal property—here, the EDA software tools—be "directly used . . . in or during the actual manufacturing . . . of tangible personal property for ultimate

15

sale"—here the semiconductor chip. *See* Tex. Tax Code § 151.318(a)(2)(A); *see also* Tex. Gov't Code § 311.021 (presuming that entire statute is intended to be effective); *Texas Citizens*, 336 S.W.3d at 628 (explaining that courts interpret statutes to give effect to each part of statute); *GTE Sw. Inc.*, 2010 Tex. App. LEXIS 4223, at \*16 (explaining that, in context of sales tax statute, "phrase 'tangible personal property for ultimate sale' denotes a product manufactured, processed, or fabricated in anticipation of a specific type of taxable transaction—the 'sale' of 'tangible personal property'"). Thus, to be entitled to an exemption under subsection (a)(2)(A), in addition to the "direct change" and "necessary or essential" requirements, Silicon Labs had the burden to "clearly show" that the EDA software tools were "directly used" in the "actual manufacturing" of the semiconductor chips, and not in preparation for the first stage of the production of those chips. *See* 34 Tex. Admin. Code § 3.300(a)(9) (defining "[m]anufacturing"); *Southwest Royalties, Inc.*, 500 S.W.3d at 404 (requiring taxpayer to "clearly show" that tax exemption applies); *cf.* Tex. Tax Code § 151.318(p) ("For the purposes of this section, the manufacturing of computer software begins with the design and writing of the code or program for the software and includes the testing or demonstration of the software.").

To the extent Silicon Labs was relying on subsection (a)(2)(A), even if we assume that it meets the definition of a manufacturer, we cannot conclude that Silicon Labs clearly showed that its purchases of the EDA software tools were exempt under subsection (a)(2)(A). *See Southwest Royalties*, *Inc.*, 500 S.W.3d at 404; *Whittington*, 384 S.W.3d at 779 n.10; *Marchand*, 83 S.W.3d at 794; *McGalliard*, 722 S.W.2d at 696. The trial court's unchallenged findings included:

16

14.     Although Silicon Labs designs, develops and sells semiconductor chips, it outsources the actual manufacturing and fabrication of the chips to a factory, or "foundry," in Taiwan.

* * *

18.     On receiving the Process design Kit [from the foundry], Silicon Labs uses the EDA software tools at issue in this lawsuit to develop and design the chip in a virtual environment.

19.     Once the design is complete, Silicon Labs creates an electronic design ("GDS") file "describing a set of photolithography masks" that the foundry will use to actually fabricate the chips.

* * *

22.     The fabrication of the photolithography masks at the foundry is the first step in the physical creation of the chip itself.

* * *

42.     Although the foundry performs its own DRC before initiating actual production of the chip, its own EDA software is used for this task, not the EDA software that Silicon Labs purchased.

43.     None of the EDA software tools purchased by Silicon Labs, and for which it seeks a tax refund, was used by the third-party foundry in its manufacturing process.

44.     Rather, the foundry uses the GDS design file created and transmitted electronically by Silicon Labs to guide it in the actual manufacture and fabrication of the chips.

Because Silicon Labs has not challenged these findings, they are binding on this Court. *See*

*McGalliard*, 722 S.W.2d at 696.

Silicon Labs argues that it uses the EDA software tools in "actual manufacturing" and

cites evidence that showed that the EDA software tools are "necessary" and "essential" to the

17

manufacture of the semiconductor chips that Silicon Labs sells. *See* Tex. Tax Code § 151.318(a)(2). Silicon Labs also argues that its design of the semiconductor chip in a virtual environment was the first stage in the "actual" manufacturing of the semiconductor chips. Applying the plain language of subsection (a)(2)(A) to the trial court's unchallenged findings of facts, however, Silicon Labs "directly"—"without any intervening space or time"—used the EDS software tools to create the GDS file. *See Webster's* at 22; *see also Scott*, 309 S.W.3d at 930. After receiving the GDS file electronically, the third-party foundry then performed its own DRC using its own EDA software tools that it purchased before initiating actual production of the semiconductor chips. This evidence supports the conclusion that Silicon Labs' creation of the GDS file was in preparation for and not an "operation beginning with the first stage in the production" of the semiconductor chip—the product for ultimate sale. *See* Tex. Tax Code § 151.318(a)(2)(A), (d); 34 Tex. Admin. Code § 3.300(a)(9) (defining "manufacturing"); *Webster's* at 1581 (defining "operation"); *see also Whittington*, 384 S.W.3d at 779 n.10 (explaining that court will not reverse erroneous conclusion by trial court if trial court rendered proper judgment); *GTE Sw. Inc.*, 2010 Tex. App. LEXIS 4223, at *16.

We further observe that Silicon Labs' proposed interpretation of subsection (a)(2)(A) would render subsection (p) meaningless. *See* Tex. Tax Code § 151.318(p) (explaining that "manufacturing of computer software begins with the design and writing of the code or program for the software"); *Texas Citizens*, 336 S.W.3d at 628 (interpreting statutes to give effect to every part). If pre-production design of a product is the first stage in actual manufacture as contended by Silicon Labs, there was no need to include a provision specifically addressing manufacturers of computer

18

software. Moreover, had the Texas Legislature intended to extend the manufacturing exemption for product design to industries other than manufacturers of computer software, it could have done so. *See GTE Sw. Inc.*, 2010 Tex. App. LEXIS 4223, at *6 (requiring exemption to affirmatively appear in statute); *see also Southwest Royalties, Inc.*, 501 S.W.3d at 104.

**Do the EDA software tools fall within the definition of "Semiconductor Fabrication Cleanrooms and Equipment"?**

Silicon Labs also argues that it was exempt under subsection (a)(2)(A) because it conclusively established that the EDA software tools were used "in connection with" the manufacture of a semiconductor product and, therefore, fell within the definition of "semiconductor fabrication cleanrooms and equipment." *See* Tex. Tax Code § 151.318(b)(2) (stating that manufacturing exemption includes "semiconductor fabrication cleanrooms and equipment"), (q) (for purposes of subsection (b), defining "semiconductor fabrication cleanrooms and equipment" as "tangible personal property, without regard to whether the property is affixed to or incorporated into realty, used in connection with the manufacturing . . . in a cleanroom environment of a semiconductor product, without regard to whether the property is actually contained in the cleanroom environment"). In addition to focusing on the phrase "in connection with" in subsection (q), Silicon Labs focuses on the phrase "without regard to whether the property is actually contained in the cleanroom environment."

Silicon Labs argues that property falling within the definition of "semiconductor fabrication cleanrooms and equipment" in subsection (q) is "deemed" to be within the exemption in subsection (a)(2). As support for this position, Silicon Labs focuses on subsection (b)(2) and

subsection (s)(1) of section 151.318 that states that "limitations in Subsection (a)(2) that refer to tangible personal property directly causing chemical or physical changes to the product being manufactured . . . for ultimate sale" do not apply to "semiconductor fabrication cleanrooms and equipment." *See* Tex. Tax Code § 151.318(b)(2), (s)(1).

Relevant to this argument, the trial court's conclusions of law included:

> The manufacturing exemption is not available to Silicon Labs simply because it may or may not manufacture semiconductor fabrication equipment under § 151.318(b) and (q). An item enumerated under § 151.318(a)(1)–(11) must still have been sold to Silicon Labs. Subsection (s) states that certain limitations in § 151.318(a)(2) do not apply to semiconductor fabrication equipment in Subsection (q). If Silicon Labs did not need to meet the requirements of § 151.318(a) and could simply rely on Subsection (q), there would be no reason for the Legislature to specify that a portion of (a)(2) does not apply.

Even if the trial court erred by this conclusion and "semiconductor fabrication cleanrooms and equipment" are "deemed" exempt under subsection (a)(2), we cannot conclude that Silicon Labs clearly showed that the EDA software tools fall within the statutorily defined term. *See id.* § 151.318(q); 34 Tex. Admin. Code § 3.300(4) (defining "equipment" to mean "[a]ny apparatus, working clothing, device, or simple machines used directly in production"), (5) (defining "fabrication" to mean "[t]o make, build, create, produce, or assemble components of tangible personal property, or to make tangible personal property work in a new or different manner"), (10) (defining "processing" to mean "[t]he physical application of the materials and labor necessary to modify or change the characteristics of tangible personal property"), (14) (defining "semiconductor fabrication cleanrooms and equipment"); *Southwest Royalties, Inc.*, 500 S.W.3d at 404, 406.

20

As support for its interpretation of subsection (q) that the EDA software tools fall within the definition of "semiconductor fabrication cleanrooms and equipment," Silicon Labs cites this Court's interpretation of the phrase "in connection with" as that term was used in a franchise tax statute. *See Titan Transp., L.P. v. Combs*, 433 S.W.3d 625, 637–39 (Tex. App.—Austin 2014, pet. denied); *see also Hegar v. Gulf Copper & Mfg. Corp.*, 535 S.W.3d 1, 9, (Tex. App.—Austin Aug. 11, 2017, pet. filed) (mem. op.) (interpreting phrase "in connection with" as used in section 171.1011(g)(3) of Tax Code to require "'reasonable nexus'" and describing phrase to be one "'of intentional breadth'" but not without "'logical limit'" (citing and quoting *Titan Transp., L.P.*, 433 S.W.3d at 637–39)).

In *Titan Transportation*, we reasoned that the phrase "in connection with" in the context in which it was used in the franchise tax statute required "a reasonable—i.e., more than tangential or incidential—relationship." 433 S.W.3d at 638. Applying this reasoning here, Silicon Labs argues that the evidence showed that the EDA software tools were "used in connection with" the manufacturing of the semiconductor chips. When considered in context, however, the phrase "in connection with" as used in subsection (q) of section 151.318 is narrower than Silicon Labs' interpretation. *See* Tex. Tax Code § 151.318(q). The plain language of the section requires a connection between the property's use and "manufacturing, processing, or fabrication *in a cleanroom environment* of a semiconductor chip." In other words, the property's use requires a reasonable nexus to the aspect of fabricating semiconductor chips in a cleanroom environment. *See Texas Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010) ("We presume

21

the Legislature selected language in a statute with care and that every word or phrase was used with a purpose in mind.").

We recognize that the enumerated examples in subsection (q) are not exclusive. *See* Tex. Gov't Code § 311.005(13) (explaining that "'[i]ncludes' and 'including' are terms of enlargement and not of limitation or exclusive enumeration, and use of the terms does not create a presumption that components not expressed are excluded"); *Sneed v. Webre*, 465 S.W.3d 169, 191–92 (Tex. 2015). The examples, however, of the types of tangible personal property that fall within the definition of "semiconductor fabrication cleanrooms and equipment" conform with the statutorily required use of the property in the context of the cleanroom aspect of fabricating semiconductor chips. *See*, *e.g.*, *Ritchie v. Rupe*, 443 S.W.3d 856, 869 (Tex. 2014) (observing that "familiar principle of statutory construction that words grouped in a list should be given related meaning," citing *Riverside Nat'l Bank v. Lewis*, 603 S.W.2d 169, 174 n.2 (Tex. 1980), "and similarly that 'the meaning of particular words in a statute may be ascertained by reference to other words associated with them in the same statute,'" citing *City of San Antonio*, 111 S.W.3d at 29); *City of Houston v. Bates*, 406 S.W.3d 539, 545 (Tex. 2013) (explaining that, when general words follow specific, enumerated categories, courts limit general words' application to same kind or class of categories as those expressly mentioned).

As previously stated, the term "semiconductor fabrication cleanrooms and equipment" pursuant to the statute "includes":

> integrated systems, fixtures, and piping, all property necessary or adapted to reduce contamination or to control airflow, temperature, humidity, chemical purity, or other environmental conditions or manufacturing tolerances, and production equipment

22

and machinery. The term does not include the building or a permanent, nonremovable component of the building, that houses the cleanroom environment. The term includes moveable cleanroom partitions and cleanroom lighting. "Semiconductor fabrication cleanrooms and equipment" are not "intraplant transportation equipment" as that term is used in Subsection (c)(1).

*See* Tex. Tax Code § 151.318(q).

Comptroller Rule 3.300(14) also provides other examples of property falling within the definition of "semiconductor fabrication cleanrooms and equipment" consistent with subsection (q)'s focus on the cleanroom aspect of fabricating semiconductor chips:

all tangible personal property that moves the product or other materials that are necessary or essential to the process, including piping that is used to move gas, liquids, deionized water, and hazardous waste material; silicon wafer moving, handling, and tracking systems; and electrical supply and control equipment, such as switches, wiring, and monitoring equipment that is incorporated into the realty. The term does not include the building or any permanent, nonremovable structural component part of the building such as vibration-isolation platforms and vibration columns.

*See* 34 Tex. Admin. Code § 3.300(14); *see also id.* § 3.300(5) (defining "fabrication"). Although the specific enumeration of property falling within the definition is not exhaustive, the properties identified in the statute and rules are types of property that are necessary to "make, build, create, produce, or assemble" the "components" of a semiconductor chip within a cleanroom environment. *See id*. § 3.300(5). On this record, the trial court could have concluded that Silicon Labs failed to clearly show how the EDA software tools had a reasonable nexus with the third-party foundry's cleanroom environment for fabricating the semiconductor chips to fall within the definition of "semiconductor fabrication cleanrooms and equipment."

23

**Were the EDA software tools necessary to control manufacturing tolerances?**

Silicon Labs further argues that the EDA software tools were used "in connection with" the manufacturing of the semiconductor chips because they fall within the example of "property necessary . . . to control . . . manufacturing tolerances" that is expressly included in the enumerated list in subsection (q). *See* Tex. Tax Code § 151.318(q). Because the word "control" is not defined in the statute, we apply its plain meaning in the context of the framework of section 151.318. *See Black's Law Dictionary* 378 (9th ed. 2009) (defining "control" to mean "[t]o exercise power over or influence over" or "[t]o regulate or govern"); *see also Southwest Royalties, Inc.*, 500 S.W.3d at 406 (considering plain meaning of term in context of framework of section 151.318). Evidence was presented to support a finding that Silicon Labs used the EDA software tools to "control" manufacturing tolerances of the semiconductor chips. The trial court's findings of fact, however, included the following:

15. The Taiwan foundry's manufacturing equipment includes "semiconductor fabrication cleanrooms" and equipment.

16. The foundry's cleanrooms include all equipment and production machinery that reduce contamination and/or control airflow, temperature, humidity, chemical purity, or other environmental conditions or manufacturing tolerances.

17. The foundry sends its "Process Design Kit" to Silicon Labs, specifying the foundry's manufacturing tolerances.

18. On receiving the Process Design Kit, Silicon Labs uses the EDA software tools at issue in this lawsuit to develop and design the chip in a virtual environment.

24

Although Silicon Labs challenges the legal sufficiency of the evidence to support finding of fact no. 16 in its reply brief, it has not challenged the other findings, and we are bound by the unchallenged findings. *See McGalliard*, 722 S.W.2d at 696. Further, sufficient evidence supports the trial court's finding of fact no. 16. *See Ortiz*, 917 S.W.2d at 772 (reviewing trial court's findings of fact by same standards applied to jury verdict for evidentiary sufficiency review). Silicon Labs' vice president of central engineering described the inside of a cleanroom as follows:

> So it depends on which fabs you're talking about, but in this case, this would be .18 micron technology or larger, so kind of some of the older fabs. So start out by putting on what we call a bunny suit to actually go into the fab to maintain the clean room environment. You have a laminar flow, which is essentially air flowing from the top of the room down to the bottom to keep particulates down. And then you have several bays where you actually operate different steps of the process. So that includes lithography, that includes etching, that includes metallization, thin film deposition. Again, everyone [sic] is wearing gloves, wearing face masks, wearing the full body suit to maintain the clean nature of the fab. And then you have what we call the boats of wafers, which are batches of 25 wafers at a time typically that are carried from station to station to process at that next step of the fab.

He also answered the following questions about the cleanroom at the third-party foundry in Taiwan:

> Q. The clean room in Taiwan that manufactured Silicon Labs semiconductor chips during the tax period was a general clean room, correct?
>
> A. Yes.
>
> Q. And the clean room environment is the main part of the foundry where the processing is done; is that right?
>
> A. Correct.
>
> Q. And it's the foundry that actually manufactures the physical chip, correct?

25

A.      Yeah, you could say that.  Yeah, that's the first physical, if you don't count the computer where all the stuff is stored.

Q.      But as for the physical chip itself, it's the foundry—

A.      Right.

Q.      —that actually manufacturers the physical chip?

A.      Correct.

In contrast to this evidence of the third-party foundry's cleanroom facility, evidence showed that Silicon Labs used the EDA software tools to design the entire chip in a virtual environment within the confines of the manufacturing tolerances as determined by the parameters of the third-party foundry's fabrication facility—not that the manufacturing tolerances were "controlled" by Silicon Labs.  *See Black's* at 378 (defining "control" to mean "[t]o exercise power over or influence over" or "[t]o regulate or govern"); *Scott*, 309 S.W.3d at 931 (explaining that "[c]ourts must not give the words used by the Legislature an 'exaggerated, forced, or constrained meaning'" (quoting *City of Austin v. Southwestern Bell Tel. Co.*, 92 S.W.3d 434, 442 (Tex. 2002))).

Although the witnesses provided conflicting testimony,[6] Silicon Labs' vice president confirmed that one of the functions of the DRC was to verify that Silicon Labs' design would adhere to the foundries' specifications and manufacturing tolerances for the entire chip as provided by the foundry in its process design kit (PDK).  Concerning how the EDA software tools and the PDK worked together, he explained:

---

[6] For example, the vice president answered "Yes" when asked if the EDA software and the process design kit are both necessary to control the manufacturing tolerances of the semiconductor chip.

So the PDK provides the parameters that set the limitations of what the mechanical tolerances are in the fab, and those parameters are fed into the EDA software so that as you're designing and trying to design for specific electrical performance of the device, the PDK will set limits on how small a transistor or how big a transistor can be or how close you can put lines together in the layout of your device. So the PDK sets the constraints under which you can design the product, the electrical performance that you're looking for.

Based on its resolution of the conflicting evidence, the trial court could have found that Silicon Labs' EDA software tools did not "control" the manufacturing tolerances but were used to operate within the manufacturing tolerances as determined by the third-party foundry's facility and equipment.[7]

---

[7] When asked, the Comptroller's expert agreed that Silicon Labs used the PDK from the foundry "to figure out what different tolerances Silicon Labs was allowed to work with." Silicon Labs' vice president testified consistently:

Q.  Because initially before Si[licon] Labs even begins its design of the chip, it's going to receive normally or typically a design kit from the Taiwan foundry, correct?

A.  Yes, that's correct.

Q.  And that design kit will contain certain specifications regarding and explaining the manufacturer's tolerances, correct?

A.  Yes, it will describe the process and the rules that are needed in order to manufacture—you know, in order to fabricate the device there.

Q.  And the design rule check is intended to ensure that the design is consistent with those specifications from the manufacturer and the tolerances, correct?

A.  Yes, that's one function of DRC.

Q.  And these specifications and tolerances that are received from the manufacturer are specifications and tolerances for the entire chip and not just the functional logic Si[licon] Labs is claiming as software entitling it to a tax refund in this case, correct?

Applying the applicable standard of review and the plain meaning of the relevant statutory language, we conclude that Silicon Labs did not "clearly show" that the EDA software tools fall within the definition of "semiconductor fabrication cleanrooms and equipment." *See Southwest Royalties, Inc.*, 500 S.W.3d at 404; *Marchand*, 83 S.W.3d at 794; *Ortiz*, 917 S.W.2d at 772; *see also City of Keller*, 168 S.W.3d at 827–28. Thus, Silicon Labs did not establish that its purchases of the EDA software tools were exempt under subsection (b)(2) and, therefore, even if property falling within the definition of "semiconductor fabrication cleanrooms and equipment" is "deemed" exempt under subsection (a)(2)(A), the purchases of the EDA software tools here were not "deemed" exempt, and Silicon Labs was required to satisfy the requirements of subsection (a)(2)(A). *See* Tex. Tax Code § 151.318(a)(2)(A), (b)(2), (s)(1), (q). As previously stated, we have concluded that it failed to do so.

For these reasons, we overrule Silicon Labs' first issue.

**Section 151.318(a)(2)(B)**

In its second issue, Silicon Labs argues in the alternative that the trial court erred by ruling that its purchases of the "digital tools components" of the EDA software were not exempt from sales taxes pursuant to section 151.318(a)(2)(B). *See id.* § 151.318(a)(2)(B). As previously stated, section 151.318(a)(2)(B) provides in relevant part:

> The following items are exempted from the taxes imposed by this chapter if sold, leased, or rented to, or stored, used, or consumed by a manufacturer: . . . (2) tangible

---

A.      It's for the—it's for the entire chip, yes.

28

> personal property directly used or consumed in or during the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale if the use or consumption of the property is necessary or essential to the manufacturing, processing, or fabrication operation and directly makes or causes a chemical or physical change to: . . . (B) any intermediate or preliminary product that will become an ingredient or component part of the product being manufactured . . . for ultimate sale.

*Id.* § 151.318(a)(2)(B). We conclude that the applicable language of this subsection also is not ambiguous for purposes of this appeal and, thus, interpret the text according to its plain and common meaning in the context of the framework of section 151.318. *See Scott*, 309 S.W.3d at 930.

Silicon Labs argues that it conclusively established that the digital tools components were used to produce a "preliminary or intermediate product"—"functional logic"—that became an "ingredient or component part" of the semiconductor chips it produced and sold. According to Silicon Labs, the functional logic is "computer software" that was incorporated and sold as a component part of the semiconductor chips, and, therefore, the digital tools that were used to design the functional logic were used in the "actual" manufacturing and made a direct change to the functional logic. *See* Tex. Tax Code § 151.318(a)(2)(B), (p) (stating that, for purposes of section, "manufacturing of computer software begins with the design and writing of the code or program for the software").

As part of this issue, Silicon Labs challenges the legal sufficiency of the evidence to support the trial court's finding of fact no. 45 in which the trial court found that "[t]he EDA software tools sold to Silicon Labs do not directly make or cause a chemical or physical change to an intermediate or preliminary product." Based on this finding, the trial court concluded that "[t]he EDA software tools sold to Silicon Labs are not qualifying items under § 151.318(a)(2)(B) because

29

they do not directly make a chemical or physical change to an intermediate or preliminary product."

Also related to this issue, the trial court's unchallenged findings of fact included:

10.   Among the ingredients or components of the semiconductor chip are the "logic gates" etched or embedded within the chip's silicon substrate.

11.   Using digital signals only, a collection of these logic gates implements "functional logic"—that is, a series of instructions or logical operations within the chip.   But not all logic gates contained in Silicon Labs' mixed-signal chip are considered to be functional logic.

\* \* \*

13.   To function properly and in accordance with its design, the functional logic implemented by the logic gates depends on its integration and interface with the chip's other components and ingredients.

\* \* \*

36.   The Verilog EDA tools are used to create the functional logic in a virtual environment.

Because Silicon Labs' theory under subsection (a)(2)(B) is based on its position that it was a manufacturer of "computer software" when it produced the functional logic, the plain language of subsections (a)(2)(B) and (p) required Silicon Labs to clearly show that the functional logic was an "intermediate or preliminary product" and "computer software." *See* Tex. Tax Code § 151.318(a)(2)(B), (p) (stating that, for purposes of section, "manufacturing of computer software begins with the design and writing of the code or program for the software"), (r); *Southwest Royalties, Inc.*, 500 S.W.3d at 404.  Because the term "product" is not defined, we apply its plain meaning.  *See Webster's* at 1810 (defining "product" as "something produced"); *Black's* at 138 (defining "product" to mean "something that is distributed commercially for use or consumption and

30

that is usu. (1) tangible personal property, (2) the result of fabrication or processing, and (3) an item that has passed through a chain of commercial distribution before ultimate use or consumption").[8]

Chapter 151 of the Tax Code also does not define "software," but "computer program" is defined to mean "a series of instructions that are coded for acceptance or use by a computer system and that are designed to permit the computer system to process data and provide results and information. The series of instructions may be contained in or on magnetic tapes, punched cards, printed instructions, or other tangible or electronic media." Tex. Tax Code § 151.0031. During the relevant time period, Comptroller Rule 3.308, under subsection (b), that is titled "software," defined "computer program" to mean:

> a series of instructions sold as a completed program which are coded for acceptance or use by a computer system and which are designed to permit the computer system to process data and provide results and information. The series of instructions may be contained in or on . . . semiconductor chips.

*See* 34 Tex. Admin. Code § 3.308(b)(1) (Comptroller of Pub. Accts., Computers—Hardware, Software, Services, and Sales); *cf. id*. § 3.308(a)(1) (defining "hardware" to include "central processing units and all peripheral equipment, parts, and supplies").[9]

---

[8] We observe that applying the plain meaning of the undefined word "product" is consistent with its other uses in section 151.318. *See generally* Tex. Tax Code § 151.318; *In re Memorial Hermann Hosp. Sys*., 464 S.W.3d 686, 701 (Tex. 2015) ("'[C]ourts should not give an undefined statutory term a meaning out of harmony or inconsistent with other provisions, although it might be susceptible of such a construction if standing alone.'" (quoting *Texas Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002))).

[9] Silicon Labs has not challenged the validity of this rule. Rule 3.308 was amended to be effective January 22, 2018, and the amended rule defines "computer program" to mean:

A series of instructions that are coded for acceptance or use by a computer system

31

To support its interpretation of section 151.318(a)(2)(B), Silicon Labs equates the statutory definition of "computer program" in section 151.0031 with the definition of "computer software" as that term is used in subsection (p) of section 151.318. *See* Tex. Tax Code §§ 151.0031, .318(a)(2)(B), (p). Because "functional logic" is "computer software," according to Silicon Labs, it uses the digital tools components during the "actual manufacturing" because the manufacturing of computer software "begins with the design and writing of the code" under subsection (p) and, therefore, the use of the digital tools components to design the functional logic satisfied subsection (a)(2)'s requirement that the property be "directly used . . . in or during the actual manufacturing." *See id.* § 151.318(a)(2), (p). The "functional logic," however, would also have to be an "intermediate or preliminary product" to fall within the plain language of the manufacturing exemption under subsection (a)(2)(B). And, applying the Comptroller rule's definition of "computer program" as related to "software," the functional logic would have to be "sold as a completed program." *See* 34 Tex. Admin. Code § 3.308(b)(1); *Southwest Royalties, Inc.*, 500 S.W.3d at 406 (explaining that, "[a]lthough the Comptroller's definition is not binding, [court] may consider it in determining the definition most consistent with the scheme of the statute"). To be entitled to a manufacturing exemption under subsection (a)(2)(B) as to the digital tools components then, it was

---

and that are designed to permit the computer system to process data and provide results and information. The series of instructions may be contained in or on magnetic tapes, semiconductor chips, punched cards, printed instructions, or other tangible or electronic media.

34 Tex. Admin. Code § 3.308(a)(1) (Comptroller of Pub. Accts., Computers—Hardware, Computer Programs, Services, and Sales); *see* 42 Tex. Reg. 353, 355 (2018).

Silicon Labs' burden to establish that the "functional logic" that was created with the digital tools components was "sold as a completed program" and that it was a "product." *See* Tex. Tax Code § 151.318(a)(2)(B), (p), (r); 34 Tex. Admin. Code § 3.308(b)(1).

Applying the applicable standard of review and the plain meaning of the relevant statutory and regulatory language, we conclude that it failed to do so. *See City of Keller*, 168 S.W.3d at 827–28; *Marchand*, 83 S.W.3d at 794. Among the evidence before the trial court, the Comptroller's expert testified that the "functional logic" could not do anything separate and apart from other components of the chip and "[i]t required the fabrication" before it was useable. In his expert report, he further opined that "there [was] no software being developed by [Silicon Labs] when using the EDA software, and no software [was] being developed by [Silicon Labs] as an ingredient or component part of another product" and concluded that "the functional logic internal to the chip does not provide a '*completed program*' since it is controlled by *external* software and therefore the functional logic cited by [Silicon Labs] does not meet the definition of 'software' as defined above by Rule 3.308." This evidence supports that "functional logic" does not fall within the plain meaning of the undefined term "product" and that it was not "sold as a completed program."

Silicon Labs argues that the functional logic falls within Rule 3.308(b)(1)'s definition of software because the functional logic was "complete as to functionality from the perspective of the seller (i.e. Silicon Labs)" and cites this Court's opinion in *Verizon North, Inc. v. Combs*, 308 S.W.3d 1 (Tex. App.—Austin 2009, pet. denied), as support for its position. In that case, the issue was whether software that was purchased by the appellant from a third-party was a "taxable item" so as to be subject to sales tax. *Id.* at 2. This Court concluded that the software fell within the

33

definition of "computer program" in section 151.0031 and that the software was "sold as a completed program" by the third party to appellant under Rule 3.308(b)(1) based on the trial court's findings of fact and, therefore, that the purchase of the software was taxable. *Id.* at 5–6. In our analysis, we explained that the focus of the rule was "on the code and design of the software as sold, not on the intended use by the purchaser" and "regardless of how the buyer intends to use the program and regardless of what modifications might be necessary in order to increase or modify its functions for the individual needs of the buyer." *Id.* at 2.

Citing this analysis in *Verizon North*, Silicon Labs argues that the functional logic was a "completed program" from its perspective as the seller and, therefore, that it was within Rule 3.308(b)(1)'s definition of a "computer program." Even if the focus of the rule is from the seller's perspective, however, the trial court's unchallenged findings contradict Silicon Labs' position. *See id.* at 2 (explaining that, absent challenge to findings of fact, appellate court accepts them as true). The trial court's findings of fact included that Silicon Labs created the functional logic in a virtual environment, and that the third-party foundry, as part of the process of manufacturing the semiconductor chips, "etched or embedded [logic gates] within the chip's silicon substrate." The trial court further found that, although some of the logic gates implemented functional logic, the functional logic "depend[ed] on its integration and interface with the chip's other components and ingredients" "to function properly and in accordance with its design." These unchallenged findings are fatal to Silicon Labs' position that the "functional logic" was "sold as a completed program."

For these reasons, we overrule Silicon Labs' second issue.

**Conclusion**

Having overruled Silicon Labs' issues, we affirm the trial court's final judgment.[10]

_____

Melissa Goodwin, Justice

Before Chief Justice Rose, Justices Goodwin and Field

Affirmed

Filed:   July 13, 2018

---

[10] Given our disposition of these issues, we do not address the Comptroller's alternative arguments to support affirming the trial court's judgment, including his arguments that Silicon Labs' purchases of the EDA software tools were excluded from the manufacturing exemption under subsection (c)(3). _See_ Tex. Tax Code § 151.318(c)(3) (excluding "research or development of new products" from manufacturing exemption); _see also_ Tex. R. App. P. 47.1.